IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 4:22CR00261 DPM |
| | ) | |
| JOHN HENSON | ) | |

### UNITED STATES OF AMERICA's SUPPLEMENTAL BRIEF

The United States of America, by and through its attorney Jonathan D. Ross, United States Attorney for the Eastern District of Arkansas, and Amanda Jegley, Assistant United States Attorney for said district, submits the following supplemental brief.

I.   PROCEDURAL BACKGROUND

On July 17, 2024, Defendant John Henson entered a guilty plea to possession with intent to distribute marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D). (ECF No. 28). As part of his plea agreement, Henson stipulated that the quantity of marijuana involved in the offense is at least 20 kilograms, but less than 40 kilograms, and that he maintained a premises for the purpose of manufacturing or distributing a controlled substance. (Id. at ¶¶5 A and C). In his plea agreement, Henson stipulated that the following facts are true:

> On May 12, 2022, DEA agents in Fairview Heights, Illinois, contacted DEA Little Rock regarding a traffic stop of a tractor/trailer, which resulted in the seizure of approximately 50 pounds of marijuana and $504,969.00. The driver arrested in Illinois cooperated with DEA agents and he advised he was on his way to deliver 35 pounds of marijuana to and pick up money from 102 Cambridge Cove in Jacksonville, Arkansas, at the direction of his source of supply in California. Agents conducted database checks on the residence at 102 Cambridge Cove in Jacksonville, and it showed to be owned by John Henson. Agents on surveillance at that address observed a black Dodge SUV in the driveway at the residence. The license plate returned to John Henson. The cooperator called Henson and asked Henson to meet him at the Super 8 motel at 1850 John Harden Drive in Jacksonville. Agents watched Henson leave his residence on Cambridge Cove and drive to the Super 8 to meet with the cooperator. Henson grabbed the suitcase of marijuana from the cooperator's trailer and put it in his SUV. Henson then handed the cooperator a cereal box.

1

> After the exchange, Henson was arrested. Inside the cereal box was a vacuum-sealed bag containing $34,000. Henson gave agents consent to search his residence on Cambridge Cove. When asked if there was anything illegal in the residence, Henson said there "might be a little bit of money and marijuana" in the house. While searching the residence, agents found a Romarm/Cugir (Century Arms, Inc.), model Mini Draco, 7.62x39mm caliber pistol, bearing serial number PMD-10907-19 in the master bedroom, as well as approximately 40 pounds of marijuana and $583,760.00 in United States currency. In a secondary bedroom, agents found large boxes of marijuana and an HS Produkt (IM Metal), model XDS 4, .45 caliber pistol bearing serial number S3196620 inside a closet. Henson told agents that the guns and drugs belonged to him. The seized substances were confirmed by the DEA lab to be marijuana. The amounts seized were suitable for distribution.

(ECF No. 28, ¶5H). Additionally, as part of his plea agreement, Henson agreed to the forfeiture of "seized cash drug proceeds in the amounts of $383,760 and $34,000," and the parties agreed to litigate the remaining $200,000 cash seized as part of sentencing. (ECF No. 28, ¶5E and ¶12).

After Henson entered his guilty plea, Henson's now ex-wife, Tippanee Waller, filed a "Response to a Notice of Judicial Forfeiture Action," in which she has claimed the U.S. Currency came from marital funds and that it was not drug money. (ECF No. 33, p. 1). Waller attached to her response two claim forms submitted to the DEA asserting that she and Henson "did not use banks to deposit [their] money" and kept their money in their house. (ECF No. 33, pp. 7, 13). Further, Waller asserted that when she and Henson separated, Henson took all of the U.S. currency without telling her. (*Id.*).

Henson subsequently moved for the return of $200,000 in cash, arguing that it should be returned because it would violate the Excessive Fines Clause of the Eighth Amendment for the Government to forfeit the remaining $200,000. (ECF No. 45). The United States responded, arguing that the remaining $200,000 at issue are drug proceeds and that the Excessive Fines Clause does not apply. (*Id.*) Currently, Henson's motion is pending. The United States renews and incorporates its response by reference in this brief. Henson's sentencing and the ancillary proceeding on Waller's claim is set for November 12, 2025.

II.     PRIOR STATEMENTS BY TIPPANNEE WALLER AND JOHN HENSON

On November 20, 2023, Henson and Waller both testified in their final divorce hearing in *Henson v. Henson,* 60DR-21-3575. John Henson testified that he had not had a job since the trucking company he had "in the teens. (Ex. 1, p. 7, lines 11-22). John Henson said he had not sold any property, including trucks, since he separated from Tippanee Waller. (Ex. 1, p. 13, lines 23-25; p. 14, lines 1-2). Henson stated they separated in March, 2018. (Ex. 1, p. 14, lines 7-8; p. 21, lines 18-19). Henson and Waller received $225,000 in 2009 as reflected on a 1099 from Around the Clock Development, and he did not take the money when they separated. (Ex. 1, p. 15, lines 8-20). Henson testified that he paid all of the bills himself out of his check. (Ex. 1, p. 26, lines 21-25; p. 27, lines 1-7). When asked about the U.S. Currency, Henson invoked the Fifth Amendment throughout the divorce hearing.

At the same hearing, Waller testified that they separated in June, 2018 and had been living separate and apart since then. (Ex. 1, p. 37, lines 24-25; p. 38, lines 3-4). Waller testified that Henson took a 2008 Ford F-350; a Lincoln, two trailers and the U.S. Currency when they separated. (Ex. 1, p. 40, lines 3-10). Waller testified that they had been saving the U.S. Currency by cashing their paychecks and putting them in a box. (Ex. 1, p. 40, lines 3-10). She explained that she believed the U.S. Currency was marital property because it came from the daycare, trucking company, jeans store, sales of business inventory and vehicles. (Ex. 1, p. 50, lines 1-21). Waller further explained that he sold cars, trucks, and trailers once he left her. (Ex. 1, p. 51, lines 11-22; Ex. 2 pp. 71-76). She then testified that she first heard that the government seized the U.S. Currency from Henson when her lawyer told her. (Ex. 1, p. 52, lines 2-6). Waller then testified that she knew of some of the U.S. Currency, but did not know the amount. (*Id.*, lines 13-15). Waller explained it was kept in a locked closet and that she did not allow him to have the U.S. Currency. (Ex. 1, lines 4-7). She

went on to say that Henson took a '76 Monte Carlo at some point in their marriage, and she last saw a Ford F-350, a 2004 Navigator, and two trailers on July 18, 2018. (Ex. 1, pp. 54-63).

Waller testified that she did not know that Henson had as much money as the amount of the U.S. Currency and stated she thought he had at least $200,000 and that she tried to get the U.S. Currency. (Ex. 1, p. 63, lines 24-25; p. 64, lines 19-21; p. 65, lines 11-13). Waller explained that she had not worked since 2017 due to illnesses. (Ex. 1, p. 65, lines 20-25). Waller said Henson was in control of everything, including the bills. (Ex. 1, p. 50, lines 22-24). Waller testified out of all the money she and Henson earned together, they "kept it all," after paying operating expenses, salaries, and supplies and they had done so since 2001. (Ex. 1, p. 73, lines 1-13). When asked at what point she believed she had $200,000 extra to keep in a box, Waller explained that she sold items from her daycare and gave Henson the money. (Ex. 1, p. 74, lines 1-18).

On March 13, 2025, Waller was deposed in this case, currently pending before this Court. Waller reiterated during her deposition that she and Henson separated in June 2018 and that Henson never returned to live with her. (Ex. 2, p. 16, lines 7-23). Waller testified that Henson took care of all the bills and paid everything, including rents, mortgages, utilities. (Ex. 2, p. 21, lines 10-12; p. 23, lines 13-25). When asked how he paid them, Waller answered "cash maybe, some checks, mostly cash back then." (Ex. 2, p. 21, lines 13-14; p. 22, lines 8-13). Waller was the manager owner of Around the Clock Daycare from 2003 to 2010 (Ex. 2, p. 25, lines 23-25). Waller closed it in December 2010 because the building went into foreclosure. (Ex. 2, p. 28, lines 19-25; p. 29, lines 1-2). She later explained that the government stopped doing vouchers and it was not "lucrative" anymore. (Ex. 2, p. 21, lines 19-24).

During her time at Around the Clock Daycare, Waller paid herself and John $800 per week. (Ex. 2, p. 33, lines 14-23). Henson handled the accounting. (Ex. 2, p. 34, line 1). Waller employed

4

15-20 workers and paid them "normal wages," and charged paying customers $120 per week while DHS paid $200 per child per week. (Ex. 2, p. 34, lines 5-25). Waller said she took the payments and put them in First Arkansas Bank and Trust. Waller then explained that she had a CPA give her, Henson, and their employees their paychecks. (Ex. 2, p. 35, lines 8-24; p. 36, lines 2-4). Waller then stated she cashed her paychecks at First Arkansas Bank and Trust, brought it home, and put it in the closet with the rest of her money. (Ex. 2, p. 36, lines 2-14). She said she cashed all of them and did not deposit them into her account. (Ex. 2, p. 36, lines 24-25; p. 37, lines 1-2). Waller admitted she had a personal bank account, but did not keep anything in the bank because her grandfather told her not to. (Ex. 2, p. 60, lines 18-20; p. 90, lines 3-9).

After the daycare closed in 2010, Waller said that she was the owner of Tuff World Trucking between 2010 to 2012 and Queen of Jeans. (Ex. 2, p. 31, lines 2-20). She said she did not get paid by a check from Tuff World Trucking, but had income from whatever was left over. (Ex. 2, p. 39, lines 17-25; p. 40, lines 1-4). Waller said that Henson did not get paid by Tuff World Trucking, either. (Ex. 2, p. 52, lines 15-17). Waller said that Tuff World Trucking grossed "over a hundred thousand" between 2010 and 2012. (Ex. 2, p. 44, lines 5-14). Waller said in 2013, that it grossed $201,478, but the business income was $5,868 was her income from Tuff World Trucking and that money came home in cash. (Ex. 2, p. 45, lines 8-16; pp. 46-47).

Waller explained she operated Queen of Jeans with Henson from 2010 to 2012. (Ex. 2, p. 50, lines 6-7). She said that the entire time she was at Queen of Jeans, she sold two pairs of jeans and that it didn't make any money. (Ex. 2, p. 69, lines 6-25, p. 91, lines 14-15). Waller said that Henson did not pay himself by Queen of Jeans and that they eventually sold all of the inventory in 2013. (Ex. 2, p. 52, lines 13-14; p. 70, lines 7-25).

After Queen of Jeans and Tuff World Trucking closed in 2012 and she and Henson started JJJC Trucking in 2014. (Ex. 2, p. 48, lines 2-14). Waller said Henson took it over and put it in his son's name, but she performed work for JJJC Trucking even though she did not get paid. (Ex. 2, p. 53, lines 2-17). Waller said JJJC Trucking was in operation until 2017 and that she did not get paid at all from that business because Henson handled all of the money. (Ex. 2, p. 54, lines 17-25; p. 55, lines 1-2). Waller said she then performed caregiving duties for a person for $400 a week between 2016 and 2018 and that she took the money home and "put in the drawer." (Ex. 2, p. 58, lines 19-25; p. 59, lines 1-14).

Waller described other income she received from the sale of assets of the daycare and Queen of Jeans between 2010 and 2013 and explained she received $15,000 from the sales. (Ex. 2, pp. 63-70). As to other income Waller received, she described receiving $9,934 from insurance for a truck in 2016 and said that she cashed it. (Ex. 2, p. 76, lines 14- 25; p. 77, lines 1-11). Waller also received an inheritance in 2010 in the amount of $25,000. (Ex. 2, p. 95, lines 10-18; p. 99, lines 7-9).

When asked how she learned about the U.S. Currency, Waller said Henson took all of the cash out of the house in 2018 and that she knew he took over $200,000 on June 18, 2018 (Ex. 2, p. 80, lines 15-20). She said the money was kept in a filing cabinet in a closet, but after receiving a foreclosure letter, she went to the closet and punched a hole in the wall and found the cabinet was gone around Christmas of 2018. (Ex. 2, p. 82, lines 1-16; p. 102, lines 8-14). Waller said she called the police but they told her it was a "marriage problem." (Ex. 2, p. 103, lines 7-10). Waller said Henson told her that he didn't have it and that it got stolen. (Ex. 2, p. 106, lines 3-25; p. 107, lines 1-6). Waller said she knew there was over $200,000 because she contributed to it and because she last counted it around Christmas, 2017. (*Id.*, lines 17-25; p. 81, lines 1-3). Waller said that

6

every time she put cash in the cabinet, Henson was with her and they did it together. (Ex. 2, p. 83, lines 2-11).

When asked how they were able to save that much money over time while having to pay living expenses, Waller stated they used "daycare money." (Ex. 2, p. 83). When asked what Waller is claiming is the source of the U.S. Currency, Waller said it was from selling assets. (Ex. 2, p. 84). Waller referred to the 1976 Monte Carlo, 2008 Ford F-350, 2004 Navigator and 2 trailers. (Ex. 2, p. 85, lines 1-3). Waller admitted she does not know how much Henson received when he sold those items in 2019. (Ex. 2, p. 85, lines 4-25; p. 86). Waller was then asked aside from the assets that were sold, what else contributed to the accumulation of the U.S. Currency. (Ex. 2, p. 87, lines 16-25). Waller said that they made over $200,000 from the daycare and that she saved as much as she could. (Ex. 2, p. 88, lines 1-19). When asked how she and Henson paid their living expenses, she responded that they paid them out of the childcare center. (Ex. 2, p. 88, lines 20-22). When asked how much of that money they actually saved, Waller could not recall but added that they added money every week. (Ex. 2, p. 89, lines 4-21). Waller said that the money was mostly saved in denominations of $100, $50, and $20 bills. (Ex. 2, p. 94, lines 1-16). Waller knew that Henson consumed marijuana, but denied that he distributed it. (Ex. 2, p. 108).

### III.   THE LAW

To prevail in an ancillary proceeding, Waller "must either demonstrate priority of ownership in the forfeited property or establish that she was a bona fide purchaser for value of the property."); *United States v. Porchay,* 533 F.3d 704, 709 (8th Cir. 2008) (same); *United States v. Timley,* 507 F.3d at 1130 (same). To establish priority of ownership under the first prong of 21 U.S.C. § 853(n)(6), the petitioner must show that "he [or she] had an interest in the property before the government's interest vested." *Timley,* 507 F.3d at 1130. The Eighth Circuit Court of Appeals

has recognized that "a third party can never have a successful claim under § 853 (n)(6)(A) if the property was the proceeds of an offense." *Id.* This is due to the relation-back doctrine, under which the government's right to the proceeds of a criminal offense vests immediately upon commission of the offense. *Id.; see also* 21 U.S.C. § 853(c) ("All right, title, and interest in property [subject to criminal forfeiture] vests in the United States upon the commission of the act giving rise to forfeiture...."); *United States v. McHan,* 345 F.3d 262, 271–72 (4th Cir. 2003) (applying the relation-back doctrine to substitute assets under 21 U.S.C. § 853(p)). In an ancillary proceeding, the burden shifts to petitioners to establish their third-party claim by a preponderance of the evidence. *United States v. Teadt*, 563 F. App'x. 421 (6th Cir. 2016).

IV.    ARGUMENT

Waller's claim that the U.S. Currency is marital property is at odds with the evidence in this case for the foregoing reasons. As reflected in the plea agreement, Henson used $34,000 to purchase approximately 35 pounds of marijuana. Therefore, $34,000 was used in the commission of a clear violation of the Controlled Substances Act and Waller is not entitled to its return.

During the search of Henson's house, the remaining U.S. Currency was found in several locations - in the bottom drawer of Henson's dresser, found underneath several large bags containing approximately 21.4 kilograms marijuana. Additionally, a firearm was found on Henson's bed. In total, approximately 40 pounds of marijuana was recovered from Henson's bedroom alone. Additional marijuana, vacuum-sealed in bags, was found in boxes in the other bedroom of Henson home, along with a second firearm. Although another individual lived in that bedroom, Henson claimed that both the gun and the marijuana belonged to him. A vacuum sealer was found in Henson's kitchen. Law enforcement agents then found a large amount of U.S. Currency hidden in a black bag in Henson's closet. The U.S. Currency from the closet was

vacuum-sealed in a similar way to the U.S. Currency Henson used to purchase marijuana earlier that day during the controlled delivery and it appeared to be labeled with the approximate amount of currency contained inside each vacuum-sealed bag. The storage and packaging of the remaining U.S. Currency is consistent with drug trafficking activity. Accordingly, neither Waller nor Henson are entitled to its return.

The United States seeks the forfeiture of the entire amount of U.S. Currency because it is money intended to be furnished in exchange for a controlled substance; it is also property used or intended to be used to facilitate a violation of a Controlled Substances Act; finally, it is proceeds of a drug-trafficking crime. Henson has already agreed that $383,760 of the U.S. Currency is proceeds and is limited to litigating at sentencing the forfeiture of $200,000 of the U.S. Currency. However, the United States believes that neither party is entitled to any of the U.S. Currency.

In the ancillary proceeding, Waller has asserted that she has a legal interest in the U.S. Currency. However, while the United States does not believe Waller's legal interest is valid, she should be limited, similar to Henson, to litigating the forfeiture of $200,000 instead of the entire $583,760 of the U.S. Currency. First, Henson was arrested in May, 2022. By her own admission, Waller had not lived with Henson in the four years preceding his arrest. Second, Waller did not ever live in the house from which the remaining U.S. Currency was seized. Third, Waller did not even know that Henson possessed $583,760 in cash. Waller now claims that she knew that she and Henson had saved over $200,000 because she counted it in December 2017, but did not know the total amount seized from Henson.

V.    CONCLUSION

When considered together, the facts of this case demonstrate that the U.S. Currency is tied to drug-trafficking activity and it should be forfeited to the United States. However, because Henson

is limited to litigating $200,000 at sentencing, Waller should be similarly limited to litigating $200,000 for reasons discussed in this supplemental brief.

JONATHAN D. ROSS
United States Attorney

By: AMANDA JEGLEY (2010045)
Assistant U.S. Attorney
425 W. Capitol Ave., Ste. 500
(501)340-2600
Amanda.jegley@usdoj.gov
