

GOVERNMENT
EXHIBIT
1

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
SECOND DIVISION

JOHN HENSON                                        PLAINTIFF

V.                          CASE NO. 60DR-21-3575

TIPPANNEE WALLER-HENSON                            DEFENDANT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RECORD OF FINAL DIVORCE HEARING

BE IT REMEMBERED, that on the 20th day of November 2023, beginning at 9:35 a.m., came on for hearing the captioned cause before the Honorable Casey Tucker, Circuit Judge, Sixth Judicial District of Arkansas, of which Pulaski County, Arkansas, is a part; the following proceedings transpired with said hearing being reported by Brandon Bonner, Arkansas Supreme Court Certified Court Reporter, the Official Reporter for said Second Division of the Circuit Court, for the Sixth Judicial District of Arkansas.

The following is a true, correct, and complete transcript of the hearing held on said date.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

    MS. MARGO WARNER
    Rolfe Law Firm
    1920 North Main Street, Suite 107
    North Little Rock, AR 72114
    (501) 604-4530
    margodwarner@gmail.com

ON BEHALF OF THE DEFENDANT:

    MR. JOHNSON OGLES
    Ogles Law Firm, P.A.
    200 South Jeff Davis
    P.O. Box 891
    Jacksonville, AR 72078
    (501) 982-8339
    jogles@aol.com

1                          TABLE OF CONTENTS

2                                                             Page

3    Style/Caption . . . . . . . . . . . . . . . . . . . .   1

4    Appearances . . . . . . . . . . . . . . . . . . . . .   1

5    Table of Contents . . . . . . . . . . . . . . . . . .   2

6    Exhibits Page . . . . . . . . . . . . . . . . . . . .   4

7    Proceedings . . . . . . . . . . . . . . . . . . . . .   5

8    Witness John Henson

9          Direct Examination by Mr. Ogles. . . . . . . . .   6

10              Defendant's Exhibit 1 Admitted. . . . . . . .   9

11              Defendant's Exhibit 2 Admitted. . . . . . . .  10

12              Defendant's Exhibit 3 Admitted. . . . . . . .  12

13          Cross Examination by Ms. Warner. . . . . . . . .  21

14          Redirect Examination by Mr. Ogles. . . . . . . .  33

15              Defendant's Exhibit 4 Admitted. . . . . . . .  35

16          Re-Cross Examination by Ms. Warner . . . . . . .  36

17    Witness Tippannee Waller-Henson

18          Direct Examination by Mr. Ogles. . . . . . . . .  37

19              Defendant's Exhibit 5 Admitted. . . . . . . .  41

20              Defendant's Exhibit 6 Admitted. . . . . . . .  49

21          Cross Examination by Ms. Warner. . . . . . . . .  52

22          Redirect Examination by Mr. Ogles. . . . . . . .  78

23          Re-Cross Examination by Ms. Warner . . . . . . .  81

24          Further Direct Examination by Mr. Ogles. . . . .  84

25    Witness Carrington Henson

1          Direct Examination by Mr. Ogles. . . . . . . . . . . 87

2          Cross Examination by Ms. Warner. . . . . . . . . . . 91

3     Defendant Rests . . . . . . . . . . . . . . . . . . . . 92

4     Closing Arguments

5          Argument by Mr. Ogles. . . . . . . . . . . . . . . . 94

6          Argument by Ms. Warner . . . . . . . . . . . . . . . 99

7          Rebuttal Argument by Mr. Ogles . . . . . . . . . . 104

8     Ruling of the Court . . . . . . . . . . . . . . . . . 106

9     Proceedings Concluded . . . . . . . . . . . . . . . . 110

10    Exhibits. . . . . . . . . . . . . . . . . . . . . . . 111

11    Certificate of Reporter . . . . . . . . . . . . . . . 173

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              EXHIBITS

                                                            Page

Defendant's Exhibits:

1:  Indictment. . . . . . . . . . . . . . . . . . . . .  112

2:  Affidavit of Financial Means, John Henson . . . . . . .  115

3:  Claim . . . . . . . . . . . . . . . . . . . . . . .  123

4:  Defendant's Responses to Plaintiff's Interrogatories

    and Requests for Production of Documents. . . . . . . .  138

5:  Estimates of Items Taken by Plaintiff/Mortgage

    Document. . . . . . . . . . . . . . . . . . . . . .  162

6:  Affidavit of Financial Means, Tippannee

    Waller-Henson . . . . . . . . . . . . . . . . . . .  166

```
 1                    PROCEEDINGS
 2  THEREUPON,
 3           THE COURT:  We are on the record.  60DR-21-3575,
 4       John Henson versus Tippannee Waller-Henson.
 5           The parties ready to proceed?
 6           MR. OGLES:  Yes, Your Honor.
 7           THE COURT:  Ms. Warner, are you ready?
 8           MS. WARNER:  Yes, Your Honor.
 9           THE COURT:  Thank you.  All right.  Mr. Ogles, if
10       you want to start, I think we're starting on the
11       counterclaim.
12           MR. OGLES:  That's right.  I call Mr. Henson.
13           THE COURT:  Mr. Henson, if you'll come on up.
14       Before you get seated, can I swear you in?
15           MR. HENSON:  Yes, you can.
16           [WHEREUPON, witness sworn.]
17           THE COURT:  Thank you.  If you'll have a seat
18       there, sir.
19           MS. WARNER:  Your Honor?
20           THE COURT:  Yes?
21           MS. WARNER:  May I make a statement, please?
22           THE COURT:  Yes.
23           MS. WARNER:  Okay.  Before Mr. Henson gets
24       started testifying --
25           THE COURT:  If you'll come to the podium.
```

```
 1                    MR. OGLES:  I'm sorry.
 2                    MS. WARNER:  I want to ensure that the Court is
 3              still on notice that he has a pending federal case
 4              that's still ongoing.  He has been advised to plead
 5              the Fifth on any issues related to that case, and I
 6              just wanted to let the Court know that that case is
 7              still pending --
 8                    THE COURT:  Thank you.
 9                    MS. WARNER:  -- and his defense attorney is here
10              as well --
11                    THE COURT:  Great.  Thank you.
12                    MS. WARNER:  -- in that case.
13                    THE COURT:  All right.  So, Mr. Ogles, do you
14              know if you're going to step into that?
15                    MR. OGLES:  I -- I found out about five seconds
16              ago, but it's fine.  I kind of anticipated that.
17                    May I proceed?
18                    THE COURT:  You may.
19   THEREUPON,
20                         JOHN HENSON,
21   having been called by and on behalf of the defendant, and having
22   first been duly sworn to tell the truth, the whole truth, and
23   nothing but the truth, testified as follows, to-wit:
24                         **DIRECT EXAMINATION**
25   BY MR. OGLES:
```

```
 1   Q    State your name.
 2   A    John Henson.
 3   Q    And your address?
 4   A    ████████████████████████████████████
 5   Q    And are you employed?
 6   A    No.
 7   Q    Do you -- do you pay rent?
 8   A    Yes.
 9   Q    How do you pay rent?
10   A    My son.
11   Q    Okay.  And when's the last time you had a job?
12   A    I haven't had a job in -- ever since the daycare closed.
13   Well, it was in -- hold up, my trucking company.
14   Q    And you -- when was that?
15                  THE COURT:  Did it close or --
16                  THE WITNESS:  Yes, it did.
17   MR. OGLES CONTINUING:
18   Q    What -- what year was that?
19   A    I'm not for sure.
20   Q    Okay.
21   A    It's been -- I don't -- I'm not for sure.  It was in the
22   teens, though.
23   Q    And you're -- you're facing federal charges that were filed
24   against you in September 2022; is that correct?
25   A    Yes.
```

```
 1    Q    Okay.  And when the police arrested you, they found
 2    $583,000 on you; is that correct?
 3    A    I plead the Fifth.
 4    Q    And why do you -- okay.  You -- so you don't want to answer
 5    that question?
 6    A    I plead the Fifth.
 7    Q    All right.
 8                    MR. OGLES:  Our Exhibit 1 will be the indictment.
 9                    MS. WARNER:  Objection.  Relevance.
10                    MR. OGLES:  How is it not relevant?
11                    THE COURT:  I know that it's an issue.
12              Obviously, this issue's been briefed.
13                    MS. WARNER:  Um-hum.
14                    THE COURT:  And so I know that this issue is out
15              there.  I'm going to overrule it --
16                    MS. WARNER:  Okay.
17                    THE COURT:  -- on relevance.
18                    MR. OGLES:  May I approach?
19                    THE COURT:  You may.
20    MR. OGLES CONTINUING:
21    Q    I don't know if you want to enter this.  Is this the
22    indictment that was filed against you?
23    A    It looks like it.
24    Q    Okay.
25                    MR. OGLES:  You got exhibit stickers?
```

```
 1                    THE COURT:  I do, all up here.
 2                    MR. OGLES:  Am I the defendant?  I can't
 3            remember.
 4                    THE COURT:  You are.
 5                    MR. OGLES:  Okay.  You want me to use 1 or A?
 6            Does it matter?
 7                    THE COURT:  I like 1.
 8                    MR. OGLES:  Offer this into evidence, No. 1.
 9                    THE COURT:  Any objection?
10                    MS. WARNER:  Yes, continued objection to
11            relevance.
12                    THE COURT:  Okay.  All right.  It will be
13            admitted over the objection.
14            [WHEREUPON, Defendant's Exhibit 1 was marked for
15            identification and is attached hereto.]
16                    MR. OGLES:  I didn't staple it, Your Honor.  I
17            need to.
18   MR. OGLES CONTINUING:
19   Q    My second exhibit is -- you prepared an affidavit of
20   financial means; is that correct?
21   A    Yes.
22   Q    Was it true and correct when you prepared it?
23   A    (No audible response.)
24                    MR. OGLES: May I approach, Your Honor?
25                    THE COURT:  You may.
```

```
 1                      THE WITNESS:  I am not -- I'm not understanding.
 2           Was it true?
 3   MR. OGLES CONTINUING:
 4   Q    Is that your signature?
 5   A    Yes.
 6   Q    Okay.  And was it the truth -- well, actually, you did it
 7   May of 2022; is that correct?
 8   A    That is correct.
 9   Q    And you didn't list any cash on hand whenever you prepared
10   this affidavit of financial means, did you?
11   A    I plead the Fifth.
12                  MR. OGLES:  Okay.  So I offer this exhibit --
13              Exhibit No. 2, his affidavit.
14                  THE COURT:  Any objections?
15                  MS. WARNER:  No objections.
16                  THE COURT:  It'll be admitted.  Thank you.
17              [WHEREUPON, Defendant's Exhibit 2 was marked for
18              identification and is attached hereto.]
19   MR. OGLES CONTINUING:
20   Q    My third exhibit is the claim -- do you remember filing a
21   claim with the federal government for the money that they take
22   -- they took from you?
23   A    I didn't -- I -- I don't remember.  What do you mean?
24                  MR. OGLES:  May I approach, Your Honor?
25                  THE COURT:  You may.
```

```
 1                      THE WITNESS:  No, I'm -- I'm just asking, what do
 2            you mean?
 3   MR. OGLES CONTINUING:
 4   Q    Do you remember your lawyer filing this for you in federal
 5   court?
 6   A    I remember that claim being filed, yes.
 7   Q    Okay.  And if I ask you any questions about where the money
 8   come from, you're going to --
 9   A    I'm going to plead the Fifth.
10   Q    I understand.  I'm -- that's your signature; is that
11   correct?
12   A    Looks like it.
13   Q    Okay.
14                      MR. OGLES:  This will be Exhibit Number 3.
15                      THE COURT:  Any objections?
16                      MS. WARNER:  Which -- which document is that?
17                      MR. OGLES:  I'm sorry.
18                      MS. WARNER:  I don't have this, Your Honor.
19                      MR. OGLES:  It was attached to my motion for
20            sanctions.  Here -- here's you a copy.
21                      Offer this in evidence.
22                      THE COURT:  Any objection?
23                      MS. WARNER:  Just a second, Your Honor.
24                      MR. OGLES:  This was attached to my motion for
25            sanctions.
```

| | |
|---|---|
| 1 | THE COURT:  When was that motion filed? |
| 2 | MS. WARNER:  No objection. |
| 3 | THE COURT:  All right.  Be admitted. |
| 4 | **[WHEREUPON, Defendant's Exhibit 3 was marked for** |
| 5 | **identification and is attached hereto.]** |
| 6 | MR. OGLES:  Thank you. |
| 7 | MR. OGLES CONTINUING: |
| 8 | Q    Now you were arrested in May of 2022; is that correct? |
| 9 | A    Yes. |
| 10 | Q    I think, actually, it was May the 13th of 2022; is that |
| 11 | correct? |
| 12 | A    Yes. |
| 13 | Q    Okay.  So you were arrested before you signed an affidavit |
| 14 | of financial means, weren't you? |
| 15 | A    I was. |
| 16 | Q    Or actually -- |
| 17 | THE COURT:  Wait -- |
| 18 | THE WITNESS:  I think -- I -- |
| 19 | MR. OGLES:  Let me -- let me rephrase that. |
| 20 | MR. OGLES CONTINUING: |
| 21 | Q    You were arrested on May the 13th of 2022, and you signed |
| 22 | your affidavit of financial means on May the 3rd of 2022, so |
| 23 | that statement wasn't correct.  You signed your affidavit before |
| 24 | you were arrested. |
| 25 | A    Wait a minute.  But when you say a statement wasn't |

```
 1   correct, I'm not --
 2   Q    My statement wasn't correct.
 3   A    Okay.
 4   Q    What I said wasn't correct.
 5   A    Right.
 6   Q    So can you tell me if you had this money with you on May
 7   the 3rd of 2022?
 8   A    I plead the Fifth.
 9   Q    Okay.  Do you know if you disclosed this money in your
10   affidavit of financial means?
11   A    What's the question again?
12   Q    Did -- did you disclose this 583,000 in your affidavit of
13   financial means?
14   A    I plead the Fifth.
15   Q    Okay.  So your son is paying your rent?
16   A    Yes, he is.
17   Q    Okay.  How long has he been paying it?
18   A    He -- my son's been paying my rent for over -- over four
19   years.
20   Q    Okay.  You understand when you plead the Fifth Amendment
21   that it has consequences for you, correct?
22   A    Sir, I understand.
23   Q    Okay.  Have you sold any property since you separated?
24   A    No, sir.
25   Q    You sell any trucks?
```

1    A    No, sir.  Them trucks was gone on the first -- on our first

2    divorce.

3    Q    Okay.  And y'all separated in June of 2018; is that

4    correct?

5    A    My mother pass -- no, my mother passed in -- my mother

6    passed in January.  We -- I -- I -- we separated in -- right

7    after my birthday, so February, like March.

8    Q    Of what year?  '18?

9    A    Correct.

10    Q    Okay.

11    A    Correct.

12    Q    Okay.  Do you know where -- you -- you filed these tax

13    returns with your -- your claim in with the -- with the federal

14    government.  Do you know where you got these tax returns?

15    A    What do you mean where I got my tax returns?

16              MR. OGLES:  May I approach, Your Honor?

17              THE COURT:  You may.

18    MR. OGLES CONTINUING:

19    Q    Where did you receive this 2007 --

20    A    Oh, sir, from my CPN -- my CPA.

21    Q    Who was your CPA?

22    A    Bob Johnson.

23    Q    Okay.  Has he still got your taxes?

24    A    I'm not for sure.

25    Q    So if I ask you if this money that was in your tax returns

```
 1   is the money the FBI seized, what --
 2   A     Sir, I refuse -- I mean, I'm -- I plead the Fifth.
 3   Q     Okay.
 4   A     Anything about -- anything about the money, anything about
 5   the -- anything besides this divorce, I'm pleading the Fifth.
 6   I'm -- you do understand -- you do understand I still have an
 7   ongoing investigation?
 8   Q     Okay.  And this states right here that in 2009 on your
 9   1099, you received $225,000; is that correct?
10   A     We both did.
11   Q     Okay.  Is that money with you?
12   A     Huh?
13   Q     Was that money with you when you separated?
14   A     What company was it?
15   Q     It was d/b/a Around the Clock Development.
16   A     Oh, yes, that was -- that's -- that was me and her, yes.
17   Q     Okay.  Did you take the money with you when you separated?
18   A     Did I take the money?
19   Q     Yes.
20   A     No, I didn't take anything.
21   Q     Okay.
22              THE COURT:  Let him get the question out before
23         you answer.
24              THE WITNESS:  Yes, ma'am.
25              THE COURT:  I've got a court reporter that cannot
```

```
 1                  take down both of you talking.
 2                  THE WITNESS:  I apologize.
 3   MR. OGLES CONTINUING:
 4   Q    So this -- this money attached to the tax returns is not
 5   the money you're claiming the FBI has?
 6   A    I plead the Fifth.
 7   Q    Okay.  How much do you pay your lawyer, your criminal
 8   defense lawyer?
 9   A    My son.
10   Q    How much did he pay?
11                  MS. WARNER:  Objection.  How is that relevant?
12                  MR. OGLES:  Well, we're going to be asking for
13             alimony.  And if you got access to funds, that's what
14             we're --
15                  THE WITNESS:  I don't have --
16                  MR. OGLES:  -- trying to figure out.
17                  THE WITNESS:  Oh, I'm sorry.
18                  THE COURT:  No.  You've got an attorney, number
19             one, okay?  You let your attorney do the arguing for
20             you.
21                  MR. OGLES:  We're asking for unequal division of
22             assets, number one.  We're asking for all the money
23             that the FBI's going after.  I know you can't order
24             the FBI to do it, but you can say in this divorce
25             hearing that she's entitled to it if we can get it
```

```
 1                     from the FBI.
 2                         Number two, we're asking for alimony.  And he's
 3                     -- he's testified he's living in a house he's not
 4                     paying rent for.  Somebody else is paying rent for
 5                     him.
 6   MR. OGLES CONTINUING:
 7   Q    And how much is your rent each month?
 8   A    $800.
 9   Q    Okay.  And how long has he been paying your rent?
10   A    Ever since I've been over there.
11   Q    And how long have you been over there?
12   A    Ever since we've been separated, about four years.
13   Q    Okay.
14                         MR. OGLES:  And then we're going be asking for --
15                     you consider all of the money that he has, and you
16                     considered his lifestyle for alimony, so if he has
17                     access to money to hire a defense attorney, I think
18                     it's something you want to know.
19                         THE COURT:  I'll overrule it.
20   MR. OGLES CONTINUING:
21   Q    How much you pay your lawyer?
22   A    Can I say something, please?
23                         THE COURT:  No.  Your attorney has objected.
24                     I've overruled her objection to it.  Now just answer
25                     the question.
```

```
 1                    THE WITNESS:  How much did I pay my attorney?  I
 2             don't know if it was -- I don't know if it was 1,000
 3             or 1,100.  I'm not for sure.
 4   MR. OGLES CONTINUING:
 5   Q    That's all you paid in federal court?
 6   A    Oh, federal court.  I -- I'm thinking you're talking about
 7   my divorce lawyer.
 8   Q    No.  I'm talking about your federal criminal defense
 9   attorney.
10   A    I'm still making payments.
11   Q    How much would you agree to pay him?
12   A    Five thousand.
13   Q    Okay.  Who's made the payments for you?
14   A    My son.
15   Q    Okay.  You get paid a lump sum?
16   A    No.  What do you call a lump sum?
17   Q    Well, I -- did -- how much have you paid him so far?
18   A    I'm -- I'm not for sure.  Him and my son's working that
19   out.
20   Q    Okay.  So who's paying your electric bill?
21   A    My son pays all my bills.
22   Q    Who's buying your food?
23   A    My -- my girlfriend is -- is buying food.
24   Q    And what's her name?
25                    MS. WARNER:  Objection.  How is it relevant?
```

```
1                    MR. OGLES:  Well, he just said his girlfriend's

2              paying it.

3                    THE COURT:  Overruled.

4                    THE WITNESS:  Her name is Lisa.

5    MR. OGLES CONTINUING:

6    Q    Lisa what?

7    A    Lisa Williams.

8    Q    Does she live with you?

9    A    No.

10   Q    Okay.  And where does she live?

11   A    She has a whole 'nother -- she -- she in Conway.  She has a

12   whole 'nother place.

13   Q    Okay.  And so she's buying all your food?

14   A    She is.

15   Q    So she -- she goes to the grocery store, to Kroger, and

16   brings it to your house?

17   A    I don't eat like that.  No, sir.  She -- whatever -- when

18   she comes, she brings it -- she brings meals and cook, and then

19   there that might be -- no leftover, I'll go out to her house and

20   eat every day.

21   Q    Who pays the gas in your car?

22   A    She does.

23   Q    What kind of car you driving?

24   A    I got a Dodge Durango, 2019.

25   Q    Is it paid for?
```

```
1   A    No, not at all.
2   Q    Who's making the payments on it?
3   A    My son.
4   Q    So your son's paying all your bills?
5   A    Yes, sir.
6   Q    What's your son do?
7   A    My son is a driver.  He's a truck driver.
8   Q    Okay.  What is White Star Lines?  Is that a trucking
9   company y'all used to have?
10  A    I haven't the slightest.  I'd never heard of it.
11  Q    Okay.  White Star Trucking?
12  A    Never heard of it.
13  Q    Okay.  So was any of this money the feds seized from you,
14  was it your son's money?
15  A    I plead the Fifth.
16  Q    Was it your girlfriend's money?
17  A    I plead the Fifth.
18  Q    Okay.  That's all I have.
19            THE COURT:  Thank you.
20            All right.  Ms. Warner.
21            MR. OGLES:  And, Judge, I would object.  If
22        you're going to take the Fifth Amendment -- I mean, I
23        know she can ask questions, but he -- he can't ask for
24        any relief if you're taking the Fifth Amendment.
25            THE COURT:  What do you mean he's asking for
```

```
 1              relief?
 2                   MR. OGLES:  I don't -- I'm just -- I guess when I
 3              see where her questions go, but you've already granted
 4              the order on the sanctions, struck his answer.  But if
 5              you're taking the Fifth Amendment in a civil case, you
 6              can't go forward and ask the Court for relief.
 7                   THE COURT:  I mean, I granted the -- his
 8              complaint.  I'm not allowing him to proceed on that,
 9              so we're proceeding on your counterclaim.
10                   MR. OGLES:  Right.
11                   THE COURT:  So what relief would he be asking?
12                   MR. OGLES:  I don't know.  I guess we'll just
13              have to wait and see.
14                   THE COURT:  Okay.  All right.  Ms. Warner.
15                        CROSS EXAMINATION
16    BY MS. WARNER:
17    Q    Mr. Henson, when did you separate?
18    A    We separated in -- I'm going to say March of '18.
19    Q    Okay.  So around March of 2018.  By the time that this --
20    the -- the incident related to the incident occurred, it was
21    2022 at that time; is that correct?
22    A    Yes.
23    Q    And you and she had been separated for four years?
24    A    Yes, ma'am.
25    Q    Okay.  Now during that four years, did you and she work
```

1    together?

2    A    No.

3    Q    Did you operate any businesses together?

4    A    No.

5    Q    Okay.  Now when you did operate a daycare center, was there

6    ever a time when you were not paying the expenses for the

7    businesses, paying employees, taxes, and all of that?

8    A    You say was there a time that I didn't?

9    Q    Yeah.

10   A    A lot of times that we couldn't afford it, I had -- I mean,

11   but I -- I still had to come up with the money.

12   Q    Okay.  So you --

13                  (Inaudible crosstalk)

14   Q    Go ahead.  I'm sorry.

15   A    I'm sorry.  Out of pocket, I -- I have, yes.

16   Q    Okay.  So you have 1099s or W2s or whatever that show

17   income where you also paying expenses for whatever business was

18   opened?

19   A    Yes.

20   Q    Was there a time that you received, let's say the $225,000,

21   and you were able to just pocket every dime of the $225,000?

22   A    No.

23   Q    Okay.  Over the years, did you and Ms. Henson operate

24   several businesses that earned a lot of money?

25   A    Yes.

1    Q    Okay.  Did she also get her share of the money at that

2    time?

3    A    Yes.

4    Q    All right.  Now when you-all operated these businesses, did

5    you have a certain amount of money that you got?

6    A    We both got a paycheck, a very large paycheck each year --

7    I mean, every other week.  We both got the same amount.  What I

8    did with mine is totally different than what she did with hers.

9    Q    Okay.  But she got the same amount of money?

10   A    She got the same amount, yes, ma'am.

11   Q    So the money that the Court is looking at, this money that

12   you-all took to operate the business and then to pay each other;

13   is that correct?

14   A    Yeah, that is correct.

15   Q    Okay.  Now from 2018 until now, do you have any idea what

16   kind of work your wife has done?

17   A    Not at all.

18   Q    Do you know if your wife is disabled?

19   A    Not at all.  I don't know -- I don't know nothing.  Haven't

20   spoken to her, haven't -- nothing, even looked at her.

21   Q    To your knowledge, has she started the process to claim the

22   money that's in your federal case?

23   A    I'm not for sure.  I don't know if she is or haven't.

24   Q    Okay.  Now you-all had a list of vehicles that you had

25   during the marriage; is that correct?

1    A    Yes, ma'am.

2    Q    Okay.  Now you testified earlier that you don't have those

3    vehicles anymore?

4    A    That is correct.

5    Q    Now at one time did you have a '76 Monte Carlo?

6    A    Oh, yes, ma'am.

7    Q    Okay.  And when did you get rid of that?

8    A    Ooh.  '14, '15.

9    Q    Um-hum.  Prior to the separation?

10   A    We was still together.  Wait a minute.  Wait a minute.

11   Listen.  This is not my -- this is not our first divorce.  This

12   is our second divorce.  The -- and we -- she -- we -- she was

13   fighting for the same things in the first divorce that -- that

14   had been -- that had -- that we had already been sold -- that

15   had already been sold.

16   Q    Okay.  So as of now, if there's a list of vehicles, a Monte

17   Carlo, a F-350 --

18   A    Um-hum.

19              THE COURT:  A what?

20              MS. WARNER: A Monte Carlo, a F-350.

21              THE COURT:  Oh, F.  Sorry.

22   MS. WARNER CONTINUING:

23   Q    -- a Navigator --

24   A    Um-hum.

25   Q    -- and two trailers, was that property disposed of during

```
 1   the last divorce?

 2   A    Yes, it was, all but one trailer.

 3   Q    And where is that trailer?

 4   A    That trailer has -- has gone -- it -- it's gone.  It got

 5   sold in '17.

 6   Q    Um-hum.  Okay.

 7   A    Right before we -- we left from over there, right before I

 8   separated.

 9   Q    And, Mr. Henson, did that divorce get completed or did you

10   close it?

11   A    I closed the day of coming and signing my final paperwork.

12   Q    Okay.

13                   THE COURT:  What does that mean?

14                   MS. WARNER:  Dismissed the case.

15                   THE WITNESS:  No -- no, the case -- oh, yeah,

16           'cause we -- we got back together.

17                   MS. WARNER:  Yes.

18                   THE WITNESS:  Yes.  I'm sorry.

19   MS. WARNER CONTINUING:

20   Q    You tried to reconcile; is that correct?

21   A    Yes.

22   Q    Okay.  Now at that point, however, the property was still

23   gone; is that right?

24   A    Yes, ma'am.

25   Q    Now, as of now and at any time during the last, let's say
```

1    three years, have you had any of these vehicles at all?

2    A    No, I have not.

3    Q    Okay.  Does she have them to your knowledge?

4    A    No, she don't.

5    Q    Okay.  Now you-all lived in a -- where did you live as a

6    married couple?

7    A    Several places.    ███████████████    We stayed

8    off of -- off of -- not McCain, off of -- yeah, we stayed off of

9    McCain on Justice Matthews.  We stayed in Western Hills in

10   Jacksonville.  We -- we stayed several places.

11   Q    Now ████████████████████ is that a home that she

12   owns?

13   A    Yes.

14   Q    Okay.  And do you know when she purchased it?

15   A    I want to say, like, '95, '94, something like that.

16   Q    Okay.  Before you-all got married?

17   A    Yes.

18   Q    And then when you were married, how many years do you think

19   you stayed in that house?

20   A    About 15 years.

21   Q    And during the 15 years that you were in that house, were

22   you paying bills?

23   A    Yes, I was.

24   Q    Were you maintaining it along with her?

25   A    No, I was paying them by myself.

```
1   Q    You were paying all of the bills?
2   A    I was paying all the bills out of my check, yes.
3   Q    And how much was the mortgage on that house?
4   A    At the time, it was like 720.
5   Q    And during the time you -- you stayed there, you paid all
6   of the bills to that house?
7   A    Yes, I did.
8                  THE COURT:  Is that in Jacksonville?
9                  THE WITNESS:  It is.  Yes, ma'am.
10  MS. WARNER CONTINUING:
11  Q    Do you know the -- who owns that house now?
12  A    Yes, I do.
13  Q    Okay.  Do you --
14  A    She signed it over to her daughter Carrington, did a quit
15  deed.
16  Q    Okay.  She did a quitclaim deed?
17  A    Yes, she did.
18  Q    Did you at any time quitclaim your interest as her husband
19  in that house?
20  A    I didn't know nothing about it.
21                 THE COURT:  When did she do that?
22                 THE WITNESS:  She did that -- you -- I'm not for
23           sure the exact date.  But she did it -- she did it --
24           it had to have been, I think, right before the
25           pandemic or it could have been after the pandemic.
```

```
 1                   I'm not for sure.
 2     MS. WARNER CONTINUING:
 3     Q    Okay.  Did you also own some handguns?
 4     A    No.
 5     Q    Okay.  And I think you testified earlier that you have no
 6     ownership in White Star Trucking; is that correct?
 7     A    Yes, ma'am.  I don't know what it -- what -- don't even
 8     know what that is.  Never heard of it.
 9                   THE WITNESS:  Excuse me.  Is there any way I
10            could get something to drink?
11                   MS. WARNER:  Got it.
12                   THE COURT:  He's going to get him some water.
13                   THE WITNESS:  I need something to drink.  Ma'am,
14            do you mind if I take my Xanax medicine, please?
15                   THE COURT:  What did you say?
16                   MR. OGLES:  I can't hear him.
17                   THE WITNESS:  I'm feeling like my anxiety and --
18                   THE COURT:  Okay.
19                   MS. WARNER:  What does he need?
20                   THE COURT:  Let's take about a ten-minute break
21            and I'll let you discuss with your counsel on that.
22                   MS. WARNER:  I didn't hear any of what he said.
23            I need to go over there?
24                   THE COURT:  We're going to take about a ten-
25            minute break, yeah.
```

1                    MS. WARNER:  Okay.

2               **(WHEREUPON, a break was held from 9:58 a.m. to**

3          **10:07 a.m.)**

4                    THE COURT:  All right.

5                    MS. WARNER:  May I proceed?

6                    THE COURT:  You may.

7                    MS. WARNER:  Okay.

8    MS. WARNER CONTINUING:

9    Q    So Mr. Henson, when you-all operated the daycare, can you

10   tell us, what did Ms. Henson do?

11   A    She ran the floor as like the -- like the classrooms --

12                   MR. OGLES:  And Judge, I'm going to object.  None

13            of this is relevant.  I let it go for a while thinking

14            we were going somewhere.  You've already stricken his

15            counterclaim and answer.  And he's --

16                   THE COURT:  So what was your question?

17                   MS. WARNER:  What kind of work did she do?  I

18            think she's asking for spousal support.

19                   THE COURT:  I agree.  So I think it's relevant.

20                   MR. OGLES:  Okay.  Even though you've stricken

21            his answer and counterclaim?

22                   THE COURT:  Well, I mean --

23                   MR. OGLES:  Okay.

24                   THE COURT:  -- again, I think it goes towards if

25            there's -- considering any kind of support.

```
 1                  MR. OGLES:  Okay.
 2                  THE COURT:  I do think that's relevant.
 3      MS. WARNER CONTINUING:
 4      Q    What kind of work does she do at the daycare?
 5      A    She ran the classrooms.
 6      Q    Okay.
 7      A    And we had over, like, 108 kids at the -- you know, at the
 8      daycare.
 9      Q    Does she have any special certifications or anything for
10      that?
11      A    Yes, ma'am.  She had to get certified -- certified to do a
12      lot of things.  But overall, she had more experience because
13      sometimes experience weigh more than a -- a degree or whatever.
14      Q    And how much experience do you know of her having working
15      in a daycare center?
16      A    Ooh, a long time.  Over -- over 18 years.
17      Q    Okay.  And at this point, do you know if she is still able
18      to work?
19      A    I honestly can't answer that, but -- but we haven't -- I
20      haven't -- our kids still correspond with each other, and no one
21      said nothing about she can't work.
22                  MR. OGLES:  Objection to hearsay.
23                  THE COURT:  Sustained.
24                  MS. WARNER:  Okay.  All right.
25      MS. WARNER CONTINUING:
```

```
1   Q    And you also had a trucking business?
2   A    Yes.
3   Q    Did she have any role in that?
4   A    Yes and no.
5   Q    What was her role in that?
6   A    She would go get -- help me get -- she would go get parts
7   for me and take them down to my mechanics.
8   Q    Okay.  So she can drive?
9   A    Oh, yes, ma'am, very much so.
10  Q    And how long did she serve as a, I guess, parts delivery
11  for the business, I guess?
12  A    It wasn't long at all.  Yes -- yes, sir, it was -- I mean,
13  ma'am, it wasn't long.
14  Q    Okay.  And what other work do you know of that she's done
15  before?
16  A    She was a manager at Burger King for over 20 years, like
17  the head -- the head store manager, and then eventually got into
18  the daycare business.
19  Q    Okay.  Do you know what her education level is?
20  A    She graduated high school.
21  Q    All right.  And what's your education level?
22  A    I got my GED, high school diploma, and I also went to
23  Pulaski Tech for early childhood education.
24  Q    Okay.  Now are you -- have you applied for disability?
25  A    I have.
```

```
 1   Q    Okay.  And is that application pending or what's the status
 2   of it?
 3   A    I just got denied last week, and I'm going back with a
 4   lawyer.
 5   Q    And what is your basis for asking for disability?
 6   A    I can't stand no longer than two -- two hours without my
 7   legs swelling, I have anxiety real bad, and I have -- my -- and
 8   I have a palpitating heart.
 9   Q    And what was that last one?
10   A    A palpitating heart.
11   Q    Palpitating heart.  And you are appealing the decision,
12   correct?
13   A    Yes, I am.  Yes, ma'am.
14   Q    And at this time, what type of work are you able to do?
15   A    I'm not able to do anything.  Probably a phone, you know, a
16   phone or something, but no -- no type of work.
17   Q    And to your knowledge, when you-all separated, did Ms.
18   Henson have a lot of money in a savings account?
19   A    You know, I don't -- I don't know.
20                 MR. OGLES:  Your Honor, I'm going to object.
21                 THE WITNESS:  Everything was a secret --
22                 MR. OGLES:  He just testified he didn't know.
23                 THE COURT:  Sustained.
24                 MS. WARNER:  Okay.  Okay.  That's all I have
25          right now.
```

```
 1                    THE COURT:  Thank you.  Mr. Ogles.

 2                    MR. OGLES:  Thank you.  Real briefly.

 3                       REDIRECT EXAMINATION

 4     BY MR. OGLES:

 5     Q    Do you remember having your lawyer answer interrogatories?

 6     A    I don't know what that is.

 7     Q    Pardon?

 8     A    Can you -- I don't know what interrogatories is.

 9     Q    Okay.

10                    MR. OGLES:  May I approach the witness and show

11             him the answers to the interrogatories?

12                    THE COURT:  You may.

13                    MR. OGLES:  And they're attached to my motion for

14             sanctions I filed on June the 5th, and I would ask

15             that they be admitted, his answers, 'cause it goes to

16             his -- may I approach?

17                    THE COURT:  You may.  You're going to put those

18             -- that document in, though, correct?

19                    MR. OGLES:  Right.

20                    THE COURT:  Okay.

21     MR. OGLES CONTINUING:

22     Q    Do you remember helping your lawyer answer these discovery

23     questions?

24     A    Sir, I can't even see.  You want -- if they answered, then

25     yeah -- yes, I -- I did -- I did help him, then.
```

1   Q    Do you remember being asked a question, Interrogatory No.

2   12, "Please state the amount of cash you had"?  And do you

3   remember what your answer was?

4   A    No.

5              MR. OGLES:  May I approach the witness, Your

6       Honor?

7              THE COURT:  You may.

8   MR. OGLES CONTINUING:

9   Q    The answered question was, "Please state the amount of cash

10  you presently have in your possession or subject to your control

11  and state the location of such cash, whether any portion of it

12  is in the currency of any country other than the United States,

13  and if so, state the amount; and if any of it is in possession

14  of any other persons, the name and address of such person."

15  What was your answer?

16  A    It says, "None."

17  Q    Was that true?

18  A    On the -- I plead the Fifth.

19  Q    You plead the Fifth?

20  A    (No audible response.)

21  Q    Okay.  So you're not going to answer that question?

22  A    I plead the Fifth.

23  Q    Okay.  I'm going to show you the date that these were sent

24  to me.  Does that state that your lawyer sent them to me on

25  August the 18th of 2022?

```
1    A    Um-hum.

2    Q    Is that a yes?

3    A    I see -- I -- that's what's written down there.  Yes, sir.

4    Q    Okay.  And we already talked about this claim you filed

5    with the federal government.  So if your answers were sent to me

6    on August the 18th of 2022 --

7              MR. OGLES:  May I approach the witness, Your

8         Honor?

9              THE COURT:  You may.

10   MR. OGLES CONTINUING:

11   Q    -- and you filed this claim with the government on August

12   the 10th of 2022, you agree with that?  That's your signature,

13   correct?

14   A    It is.

15   Q    That was admitted.  Was your answers to discovery a lie?

16   A    I plead the Fifth.

17   Q    Okay.

18              MR. OGLES:  And this will be our next exhibit,

19         Your Honor.  I can't remember what number I'm on.

20              THE COURT:  You're on 4.

21              MR. OGLES:  His answers to discovery.

22              THE COURT:  Any objection?

23              MS. WARNER:  No objection.

24              THE COURT:  Be admitted.

25              **[WHEREUPON, Defendant's Exhibit 4 was marked for**
```

```
 1                  identification and is attached hereto.]

 2                     THE COURT:  Have you marked this?

 3                     MR. OGLES:  I marked it.

 4                     THE COURT:  Thank you.

 5                     MR. OGLES:  That's all I have.

 6                     THE COURT:  All right.  Ms. Warner, any

 7          follow-up?

 8                     MS. WARNER:  Yes.

 9                     RE-CROSS EXAMINATION

10   BY MS. WARNER:

11   Q    Mr. Henson, by August of 2022, the forfeiture action had

12   already occurred; is that right?

13   A    Yes.

14   Q    Okay.

15                     MS. WARNER:  No further questions.

16                     MR. OGLES:  I have nothing.

17                     THE COURT:  Thank you.  You may stand down.

18                     THE WITNESS:  Thank you.

19                     THE COURT:  Thank you.

20                     MR. OGLES:  I call my client, Ms. Henson.

21                     THE COURT:  All right.  Ms. Henson.  Before you

22          get seated, can I swear you in?

23                     THE DEFENDANT:  Thank you.

24                     [WHEREUPON, witness sworn.]

25                     THE COURT:  Thank you.  You may proceed.
```

```
 1                    MR. OGLES:  May I proceed?

 2                    THE COURT:  Yes.

 3                    MR. OGLES:  I know you just said I could.  It's

 4          just a habit.

 5  THEREUPON,

 6                         TIPPANNEE WALLER-HENSON

 7  having been called by and on behalf of the defendant, and having

 8  first been duly sworn to tell the truth, the whole truth, and

 9  nothing but the truth, testified as follows, to-wit:

10                         DIRECT EXAMINATION

11  BY MR. OGLES:

12  Q    State your name.

13  A    Tippannee Waller-Henson.

14  Q    And your address?

15  A    ████████████████████████████████

16  Q    Okay.  There's been some questions about your house.  Did

17  you buy that house before you got married?

18  A    Yes.

19  Q    Do you remember when?

20  A    In '99.

21  Q    Okay.  And who lives there now?

22  A    Me and my -- my two -- three daughters.

23  Q    Okay.  And when did you and Mr. Henson separate?  He said

24  March of '18.  Is that pretty close?

25  A    No.  It was June.
```

1   Q    Okay.  Of '18, though?

2   A    Of '18, yes.

3   Q    And y'all been living separate and apart since then, right?

4   A    Yes.

5   Q    And you're a resident of Pulaski County?

6   A    Yes.

7   Q    And you have been at least for the last -- since you bought

8   the house in '99; is that correct?

9   A    Yes.

10  Q    Okay.  What's the condition of the house?

11  A    It's horrible.  We have no heat, no air.  We have no stove.

12  We have nowhere to take a shower.  It's just really bad.

13  Q    Where do you take a shower?

14  A    At -- at the gym.

15  Q    And what's the name of the gym?

16  A    Ten Fitness.

17  Q    Okay.  And why is that?

18  A    Because the -- the -- the water sits in the tub because the

19  -- the sewage is bad --

20  Q    Okay.

21  A    -- up under the house.

22  Q    Can you afford to fix -- to hire a plumber?

23  A    No, I cannot.

24  Q    Can you afford to hire someone to fix -- to replace the air

25  conditioner and heat?

```
1    A    No.

2    Q    Okay.  How old is the house; do you know?

3    A    How old is it?  No, I don't know.

4    Q    Okay.

5              THE COURT:  When did they marry?

6              MR. OGLES:  I'm sorry.

7    MR. OGLES CONTINUING:

8    Q    When -- you got married in 2001; is that correct?

9    A    Yes.

10   Q    When?  I had forgot that part.

11   A    November 17th --

12   Q    Okay.

13   A    -- 2001.

14   Q    That's good.

15             MR. OGLES:  May I approach the witness?

16             THE COURT:  You may.

17   MR. OGLES CONTINUING:

18   Q    Okay.  I want to show you what will be our next exhibit.

19             THE COURT:  Five.

20   MR. OGLES CONTINUING:

21   Q    And I'm going to ask you to look at this.  And you prepared

22   this for me; is that correct?

23   A    That's correct.

24   Q    And what's the -- tell me what this is.  We'll go through

25   it.  First page.
```

```
 1    A     The things that we had.

 2    Q     Okay.  What is it?

 3    A     We had a 2008 Ford F-350; a Lincoln; we had two

 4    trucks-trailers; and this -- and money.

 5    Q     Pardon?

 6    A     And money.

 7    Q     Okay.  And what happened to these things?

 8    A     He took them when he left the home.

 9    Q     When y'all separated?

10    A     Yes.  In 2018.

11    Q     Okay.  And then below that, that figure's not correct,

12    obviously.  But the heat and air, did you get an estimate on the

13    heat and air in 2019?

14    A     Yes.

15    Q     But this is --

16    A     But now it's seven -- it's $8,000.

17    Q     Okay.  And -- and I tell you what, it would be easier to do

18    it this way.  This is something you prepared; is this correct?

19    A     Yes.

20    Q     Okay.  And the second page is a estimate from Meredith Heat

21    & Air --

22    A     Yes.

23    Q     -- but you're not relying on that estimate, correct?

24    A     No.

25    Q     The third page is what?
```

1    A    My mortgage.

2    Q    Okay.  Are you in foreclosure on your mortgage?

3    A    Not at this time, but I'm under a modified.

4    Q    You have some kind of modified agreement?

5    A    Yes.

6              MR. OGLES:  Okay.  This will be our Exhibit No.

7         5, Your Honor.  Offer this in evidence, then I can go

8         over it with her.

9              MS. WARNER:  What is it?  Which one is No. 5?

10        Okay.

11             THE COURT:  No objections?

12             MS. WARNER:  No objections.

13             THE COURT:  It's received.

14             **[WHEREUPON, Defendant's Exhibit 5 was marked for**

15             **identification and is attached hereto.]**

16             MR. OGLES:  Thank you.

17   MR. OGLES CONTINUING:

18   Q    So what are we looking at there?  So the Court can

19   understand, the -- the type of equipment you testified is what

20   he took when he left?

21   A    Yes.

22   Q    And then the heat and air, the only point you're trying to

23   make there is that it's got to be replaced; is that correct?

24   A    Yes.

25   Q    How long have you not had heat and air?

```
1    A    Since the day he left.
2    Q    Why the day he left?
3    A    The machine blew up.  He had some person to come in and put
4    a new machine in.  And when I called the people out, they told
5    me that I shouldn't have had that unit, it was too big for my
6    house.  So therefore, it had blew the -- it had -- my house used
7    two coils, and the four -- 4,000 was four coils.  And we didn't
8    have that, so the other coil -- the other that's supposed to go
9    into the house, it went back into the system and blew it up.
10   Q    Okay.
11   A    'Cause it was -- it was an -- no -- not a licensed person
12   to do that.
13   Q    Okay.  What about the bank from 7/17/18?  What are you
14   talking about there?
15   A    Well, that's what he left and he had his girlfriend on
16   there.
17   Q    Do you know how much money we're talking about?
18   A    I don't know.
19   Q    Okay.  Midland Mortgage, is that the back payment you owe?
20   A    Yeah, for the lawyer to get out of foreclosure.
21   Q    But you still owe that money?
22   A    Yes.
23   Q    You also got a current mortgage payment; is that correct?
24   A    Yes.
25   Q    How much is that?
```

```
 1   A    Six -- 600.

 2   Q    Okay.  Right below that is '99 FRHT.  What is that?

 3   A    That was a -- that was a -- a truck, an 18-wheeler truck.

 4   Q    Who's got that?

 5   A    He had it.

 6   Q    Okay.  What's that 9,000 mean?  That figure.

 7   A    Oh, I don't know.

 8   Q    Is that what you're asking for it or is it worth more than

 9   that?

10   A    Well, yeah.

11   Q    Well, answer my question.  Is it --

12   A    Yes.

13   Q    Yes what?

14   A    It's -- it's what it's worth.

15   Q    Okay.

16             MS. WARNER:  Objection.  Can we get some kind of

17         foundation?  She's just got a handwritten list and

18         numbers that she wrote.

19   MR. OGLES CONTINUING:

20   Q    You wrote this, right?

21   A    Yes.

22   Q    Were you part owner of this truck?

23   A    Yes.

24   Q    Okay.  Is this, in your opinion, what it's worth?

25   A    Yes.
```

```
1   Q    Okay.  Tattoo cover-up, what is that?

2   A    Yeah.  That's his name on my back.

3   Q    Did you have it done or you want to have it done?

4   A    No, he had it -- we had it done.

5   Q    No, do you want -- has it been removed?

6   A    No, it hasn't.

7   Q    You want it removed?

8   A    Yes.

9   Q    Is that how much it's going to cost?

10  A    Yes.

11  Q    What is the Comcast cable?

12  A    The -- he had all this gaming stuff and he didn't pay

13  Comcast, and they put it on me for cable.

14  Q    Did you pay it?

15  A    No.

16  Q    Okay.  So you don't have cable at your house?

17  A    No.

18  Q    Okay.  What is the down payment on the 2020 car?

19  A    'Cause he bought a new car, and I thought he had bought a

20  house, but I see he's just renting.  But he does have a new car.

21  Q    What kind of car does he have?

22  A    I don't know.  A Dodge Durango.

23  Q    Okay.  Emotional distress, you're not asking for emotion --

24  I've explained to you you don't ask for emotional distress.  You

25  understand that, right?
```

```
 1   A    Yes, I do.

 2   Q    Are you asking for alimony though?

 3   A    Yes.

 4   Q    Okay.  And how much are you asking for?

 5   A    At least a thousand a month.

 6   Q    For how long?

 7   A    For five years.

 8   Q    Okay.  And why is that?

 9   A    Because he left me with zero dollars.  He left me in a

10   broken home.  He left -- and no transportation.  I didn't -- oh,

11   my God, let me calm down.

12   Q    It's okay.  All right.  How is your health?

13   A    It's bad.

14   Q    Tell me about it.

15   A    I have neuropathy in my feet, and I have other issues that

16   I don't want to discuss right now.

17   Q    What about your bills?  Who's helping you pay your bills?

18   A    My children.

19   Q    Okay.  You have a car?

20   A    I do not have a vehicle.

21   Q    Okay.  What is that two handguns?  Are those two handguns

22   he had?

23   A    Yes.

24   Q    He took?

25   A    Yes.
```

```
1    Q    Okay.  White Star Trucking: what is that?

2    A    He say he don't know nothing about it, but I saw it on his

3    application when he got his car.  That's what he put down.

4    Q    That he worked?

5    A    Yes.

6              MS. WARNER:  Objection.  Is she referring to

7         hearsay?

8              THE WITNESS:  No.  It's on his credit report.

9    MR. OGLES CONTINUING:

10   Q    So you saw -- you -- you saw --

11   A    Yes.

12   Q    -- his credit report?

13   A    Yes.

14   Q    Okay.

15             MS. WARNER:  That's still hearsay.

16             MR. OGLES:  I'm not sure that's an admission.

17             MS. WARNER:  We don't have the document even.

18        There's not a person to testify to it.  We don't even

19        have the document.  She's referring to something she's

20        saying she read at some point in time.

21             MR. OGLES:  Well, let me rephrase the question.

22             THE COURT:  Okay.

23   MR. OGLES CONTINUING:

24   Q    How do you know that he has -- he worked for White Star

25   Trucking?
```

```
1    A    I looked on his application -- on his application.

2    Q    How did you see his application?

3    A    I looked on his credit report and it's --

4    Q    Okay.  And how did you look on his credit report?

5    A    I went -- I had his -- his Social Security number and I

6    just looked it up.

7    Q    Okay.  And that's what you saw?

8    A    Yes.

9    Q    Okay.

10              MS. WARNER:  Objection.  She still hasn't -- she

11          doesn't have the document.  We don't --

12              MR. OGLES:  I mean, it's -- it's -- she can

13          testify to what she saw and go to the weight, whatever

14          you want to do.

15              MS. WARNER:  So then my client would have no way

16          to controvert this evidence, so --

17              THE COURT:  I mean, there's no proof that White

18          Star Trucking even exists or a value.  There's

19          nothing, so.

20              MR. OGLES:  Okay.  That's fine.

21    MR. OGLES CONTINUING:

22    Q    And Midland Mortgage, did they ever file suit against you,

23    or do you just have to work out some kind of agreement?

24    A    I had to work out an agreement because he wouldn't sign the

25    modification.
```

```
 1   Q    Okay.

 2   A    And that's why I had to deed it over to my child.

 3   Q    Okay.

 4                THE COURT:  Wait.  Was his name on the mortgage?

 5                THE WITNESS:  No.  But the mortgage said since I

 6        was married to him, I had to do that.

 7   MR. OGLES CONTINUING:

 8   Q    So what -- did you do a quitclaim deed -- deed to your

 9   child?

10   A    Yes.

11   Q    Okay.  And that's because you had to do a workout

12   agreement?

13   A    Yes.

14   Q    Okay.  So this will be our affidavit of financial means.

15                MS. WARNER:  I don't have a copy of that.

16                MR. OGLES:  Hang on.  I'm giving it to you right

17        now.  You had it.

18                Can I approach, Your Honor?

19                THE COURT:  You may.

20   MR. OGLES CONTINUING:

21   Q    Is this your affidavit of financial means?

22   A    Yes.

23   Q    Okay.  And this is -- you don't have any income coming in?

24   A    No.

25   Q    Okay.  And you have monthly expenses of $2,100?
```

1    A    Yes.

2    Q    Are they -- your kids help you on that?

3    A    Yes.

4    Q    Okay.  Then the next page is your current monthly expenses;

5    is that right?

6    A    Yes.

7    Q    Okay.  Okay.  That's your signature on the back, right?

8    A    Yes.  Yes.

9                    MR. OGLES:  Be our Exhibit No. 6.

10                   THE COURT:  Any objection?

11                   MS. WARNER:  To her -- no.  No, Your Honor, no

12            objection.

13                   THE COURT:  Be admitted.

14            **[WHEREUPON, Defendant's Exhibit 6 was marked for**

15            **identification and is attached hereto.]**

16   MR. OGLES CONTINUING:

17   Q    Now you heard him testify about the money the FBI took.

18   Did you know anything about that?

19   A    Yes.

20   Q    About the money the FBI took?

21   A    Yes.

22   Q    How did you know about it?

23   A    'Cause we had been saving forever.  We took our paychecks

24   home from the daycare, and we cashed 'em and put 'em in a box,

25   cash, put 'em in a box.  We had -- we had -- around the clock,

```
 1    we had the trucking company.  We had the jeans store.  We had a
 2    lot of things going on at the time.  And we sold everything in
 3    the daycare.  I'm talking about 3-passenger van -- I mean,
 4    15-passenger vans, three of those.  We sold tons of cars.
 5    Q    Okay.  And --
 6    A    My daycare was the first one to be open 24 hours, and we
 7    were open and full every day for 15 years, 24 hours.
 8    Q    All right.  And you know you're asking for half because you
 9    believe it's marital property; is that correct?
10    A    It is, yes.
11    Q    But you're wanting all of it as a sanction from him; is
12    that correct?
13    A    Yes.
14    Q    For lying on his discovery?
15    A    Yes.  Yes.
16    Q    Okay.  And then you --
17    A    He sold -- he sold all these items.
18                 MS. WARNER:  Objection.
19    MR. OGLES CONTINUING:
20    Q    He sold all those items?
21    A    Yes.  He sold all these items --
22                 THE COURT:  Hold on.
23                 THE WITNESS:  -- after we were --
24                 THE COURT:  Hold on.  Hold on.
25                 MS. WARNER:  Objection.  We -- we don't know
```

```
 1                 where her testimony's coming from.  She's got them on
 2                 a handwritten list.  She's not produced proof of any
 3                 sales, any tax records, any assessments, no nothing to
 4                 corroborate this.
 5                     THE COURT:  I mean, she can testify that's what
 6                 she believed occurred.  We see it every day, but --
 7                 you can certainly cross-examine.
 8                     MR. OGLES:  Well, we know the FBI confiscated a
 9                 lot of cash.
10     MR. OGLES CONTINUING:
11     Q    So it's your testimony that cash came from yours and his
12     businesses?
13     A    Yes, and -- and -- and items.  The cars, the trucks, the
14     trailers, all of that.  He sold all of those things once he left
15     me.
16     Q    So it -- when you -- before he left you, you still had all
17     these items; is that correct?
18     A    Yes, we had those items.
19     Q    Talking about the '76 Ford, '08 Ford --
20     A    Yes.
21     Q    -- all the things in your exhibit?
22     A    Yes.
23     Q    Okay.  Now have you applied for Social Security disability?
24     A    Yes.
25     Q    Are you -- have you received an outcome yet?
```

1    A    No, not yet.

2    Q    Okay.  When is the first you heard that the government had

3    confiscated over almost $600,000 from him?

4    A    You.

5    Q    When I told you?

6    A    Yes, sir.

7    Q    Okay.  Before that, did you know it?

8    A    I did not know.

9                MR. OGLES:  That's all I have, Your Honor.

10                THE COURT:  All right.  Ms. Warner.

11                         **CROSS EXAMINATION**

12    BY MS. WARNER:

13    Q    So, Ms. Henson, it's your testimony that you knew that he

14    had almost $600,000 --

15    A    I knew of some.  I didn't know the -- the amount.

16    Q    Okay.  Where was it?

17    A    I couldn't tell you all of it because he sold these

18    products after he left me.

19    Q    Okay.  That's fine.

20    A    And everything over here --

21    Q    Where was the money?

22    A    -- could be over $10,000.

23    Q    Where was the money?

24    A    Excuse me?

25    Q    Where was the money?

1   A   In the -- in the closet, in a locked closet.

2   Q   Okay.  Now you-all separated in 2018?

3   A   Yes.

4   Q   And so you allowed him to have $600,000 --

5   A   No, I did not.

6   Q   -- from 2018 --

7   A   No, I did not.

8   Q   Um-hum.

9   A   He -- the -- this is how we got to this point.  He told me

10  he was going over there to his mother's house, clean out her

11  house, and get her -- get the brother somewhere to stay.

12  Q   And when was this?

13  A   And so he did that -- that was in July.

14  Q   Of what year?

15  A   '18.

16  Q   Okay.

17          MR. OGLES:  All right.  Finish your point.

18  A   He didn't tell me he was leaving me.  So everything stayed.

19  One day we -- the -- me and my kids left, he came into the house

20  and he took all -- everything he wanted to take.  And then, he

21  told me he was leaving me.

22  Q   Um-hum.

23  A   And all these items was -- John, you've got to give me

24  something.  I don't got to give you nothing.

25  Q   Um-hum.

```
1    A    And that's it.  That's how that all became.

2    Q    And you-all had been married for how long?

3    A    Almost 20 years.

4    Q    Okay.  Out of the 20 years, you-all owned this property and

5    now it's gone, right?

6    A    Yes.

7    Q    Do you have any proof of when it left or where it went or

8    any of that?

9    A    No.  I know I had it.

10   Q    You know you had it?

11   A    I've -- I've been driving 'em.

12   Q    At some point in 20 years?

13   A    Yes.

14   Q    Okay.  Now let's go item by item.  When was the last time

15   you saw the '76 Monte Carlo?

16   A    That's been a while.

17   Q    Like, how long?

18   A    I -- I can't tell you how long that was.

19   Q    No idea?

20   A    No.

21   Q    Somewhere in 20 years, right?

22   A    Yes.

23   Q    Okay.  What about the Ford F-350; when did you last see

24   that?

25   A    July 18th, 2018.
```

1   Q    Okay.  And how do you know that specific date?

2   A    Because that was my -- the -- that was my daughter's

3   birthday.  That's how I know all these things.  It happened

4   around her birthday.

5   Q    Okay.

6   A    And he had that -- he had that Lincoln.  He had all of this

7   stuff.

8   Q    Okay.  So 2004 Navigator; when was the last time you saw

9   it?

10  A    Same thing, July 18th.

11  Q    July 18th?

12  A    Um-hum.

13  Q    Okay.  And where did you see these things at?

14  A    At my house.

15  Q    Okay.  And the '91 18-foot trailer, the first one?

16  A    He had it.

17  Q    Where?

18  A    He had it in a -- at a friend's house.

19  Q    Okay.

20  A    Where he stored --

21  Q    When did you last see it?

22  A    -- where he stored his trucks.

23  Q    When did you last see it?

24  A    And I last seen it July 18th.

25  Q    Okay.  So you were at your house July 2018, and you also

```
1    went to visit a storage July 18, 2018; is that correct?
2    A    Visit a storage?
3    Q    You said it was in storage at a friend's place.
4    A    No, it was a friend's yard.  That's where he stored all his
5    trailers.
6    Q    Okay.  And you --
7    A    And that -- and that was the last time I saw it.
8    Q    July 18th, 2018?
9    A    Yes.
10   Q    Okay.  The second trailer you have listed, the same with
11   that one?
12   A    Same one.
13   Q    Okay.  Now can you tell us, why were you going to these
14   properties on your daughter's birthday?
15   A    Because I needed to know what was going on.  I -- we even
16   went over to his house and beat down the door.  He wouldn't
17   answer the door.  I did that several times.  Then when I first
18   -- then when I got to see him, he hit me with -- he hit me -- my
19   daughter's car for me to get out of his way.
20   Q    Um-hum.  Okay.  So out of these first five pieces of
21   property, you don't have any assessments, know nothing about
22   these pieces of property, do you?
23   A    Yes.
24   Q    Okay.  What do you have?
25   A    I have the -- where he signed -- forged my name off of --
```

```
1    off of the -- the cars.
2    Q    All of these?
3    A    Yes.
4    Q    Okay.  Are you producing it?
5    A    Yes.
6    Q    Okay.
7              MR. OGLES:  Can she stand down and get it, Your
8         Honor?
9              MS. WARNER:  She says she's got it.
10             THE COURT:  She's asked for it, yes.
11   MS. WARNER CONTINUING:
12   Q    Okay.  Now come tell us what you have.
13   A    I have -- I have a registration for one of the trucks.  And
14   I have him forging my name off of these cars.  I have -- it's
15   still getting mail from JJJC, where we -- we had a trucking
16   company, and Queens and Jeans.  Here's another registration, and
17   that's all I have.
18             MS. WARNER:  May I approach, Your Honor?
19             THE COURT:  You may.
20   MS. WARNER CONTINUING:
21   Q    So Ms. Henson, if you have the title to the Navigator,
22   where is it?
23   A    He sold it.
24   Q    Without the title?
25   A    Yes.
```

1    Q    How long have you had this title?

2    A    I just found the title when he left.

3    Q    Okay.  Do you have some type of proof that it was sold?

4    A    No.

5    Q    Okay.  But you have the title but no vehicle?

6    A    Right.

7    Q    Okay.

8    A    And that's not my hand -- that's not my signature.

9    Q    Okay.  And then --

10   A    And then, he -- he sold it to his brother.

11   Q    Okay.  And how do you have the title to the Ford?

12   A    I do not know.  I just went through all his paperwork and

13   that's what I found.

14   Q    Um-hum.  Okay.  So you have no idea what these documents

15   really are; is that correct?

16   A    What do you mean I don't know what they are?

17   Q    You have the titles?

18   A    He left the titles.

19   Q    Okay.  So where are the vehicles?

20   A    Ask him.

21   Q    How do you have the titles?  That's my question.

22   A    I don't -- he left his paperwork.

23   Q    So you're saying he sold them without titles?

24   A    He -- he left his paperwork there clearly.

25   Q    Okay.  All right.  Now the date on those are 2018; is that

```
1    correct?

2    A    Yes.

3    Q    And you guys have separated and reconciled since 2018; is

4    that right?

5    A    Yes.

6    Q    Okay.  And so --

7    A    I also have my daughter to -- that can testify that the

8    cars were there and real.

9    Q    Okay.  Five years ago?

10   A    Yes.

11   Q    Okay.  Now when you-all reconciled after 2018, what

12   happened to all of that property?

13   A    We had -- it came right on back.

14   Q    Okay.  And so where is it now?

15   A    We started a whole new company, driving the car and the --

16   and the big -- and the -- the dually; it all came back.

17   Q    Okay.  That was in 2018?

18   A    Yes.  No one was driving it but me.

19   Q    Okay.  And then 2019 when it all came back, then what

20   happened to it?

21   A    When he left, he took that -- those items.

22   Q    You said he took it in '18 and then you reconciled?

23   A    I mean, '18.  He took all of those items.

24   Q    And they came back?

25   A    No, they did not.  When he left in '18, he took everything.
```

1    I didn't even have a car.  I had to borrow a car to take my

2    daughter to school for three days.

3    Q    Ms. Henson, did you not just say they all came back and I

4    was driving?

5    A    No, I did not.  I said when he first came back from the

6    first divorce, he came back with all of the things that I was

7    asking for.

8    Q    Okay.

9    A    And we reconciled.  The end of that.

10   Q    Okay.

11   A    And they would have been in my possession all that time.

12   John couldn't drive.

13   Q    They've been in your possession all of what time?

14   A    They've been -- since -- since our last divorce and up 'til

15   now, up 'til July 18th, they were in my possession.

16   Q    Ms. Henson, can you give us dates?  Your years are not

17   making sense.

18   A    July 18th, 2018, I had all these possessions.

19   Q    Okay.

20   A    Once he left the house, I did not have it anymore.

21             THE COURT:  I'm sorry.  I thought he left in June

22        of 2018?

23             THE WITNESS:  Yeah, June of 2018, I'm thinking.

24             MR. OGLES:  I think we allege June the 1st, 2018.

25             THE COURT:  Well, hold on, though.  You're

```
1              confusing me.
2                   MS. WARNER:  Okay.
3                   THE COURT:  Did you have these in possession
4              after he left?
5                   THE WITNESS:  No.
6                   THE COURT:  You're saying he took them once he
7              left?
8                   THE WITNESS:  He -- yes, he did.
9                   THE COURT:  Okay.  So --
10                  THE WITNESS:  And my daughter can testify.
11                  THE COURT:  Is her birthday in June or July?
12                  THE WITNESS:  It's in July.
13                  THE COURT:  So did he leave in July or are you
14             saying he came back around --
15                  THE WITNESS:  Well, the whole thing started with
16             him telling me was going to grieve his mother and to
17             get his brother somewhere to stay and clean out her
18             house.  We were okay.  We were okay.  Nothing -- no
19             divorce was going on or anything.  So then I said,
20             "John, I need the car."  He was like, "Car in -- in
21             the shop.  It's in the shop."  I said, "Well, I have
22             to get my child to school."  And he said, "Find
23             somebody."  So that's what I did.  I thought the cars
24             were in the shop.  He never said anything about
25             leaving me.  He got what he wanted and he left, high
```

```
 1              and dry.  And then I got three -- three months of
 2              bills had to be paid.  My house went in foreclosure.
 3              It's just -- without having a car at 50, having to
 4              start all over.  John ain't worked nothing.  He has
 5              not worked -- he done work my feet to the bone.  John
 6              would sit on that side of that bed and didn't move out
 7              that -- out that -- out of that room.  I did all the
 8              footwork.
 9  MS. WARNER CONTINUING:
10  Q    Ms. Henson, earlier you stated he left on your daughter's
11  birthday, which is July 18th, 2018.
12  A    No, I said I -- I noticed my truck -- those trucks was gone
13  July 18th.
14  Q    Did you or did you not say, "These vehicles were at my
15  house on July 18 of 2018"?
16  A    Hum-um.
17              THE COURT:  You -- you did --
18              MS. WARNER:  You did not --
19              THE COURT:  -- earlier --
20              THE WITNESS:  I didn't mean to.
21              THE COURT:  -- state that.
22              THE WITNESS:  I didn't mean to.  She said when I
23              last saw them.  I last saw them on July 18th at his
24              house.
25  MS. WARNER CONTINUING:
```

1    Q    So now you're back to saying you did see them July 18th?

2    A    I did -- yes.  At his -- at his home in his garage.

3    Q    And you saw the two trailers?  They were in storage at his

4    friend's --

5    A    No, I went to --

6    Q    -- place?

7    A    -- no, I went to his friend's house on his yard and looked,

8    and they were gone.  And he told me John had sold them.

9    Q    Okay.  So how do you have -- do you have any proof of any

10   of this?

11   A    I just showed you that we had trucks and trailers and cars

12   and -- and all of that.

13   Q    Okay.  So if throughout the marriage you guys have bought

14   and sold property, are you supposed to be able to just list what

15   you want him to now pay for out of the 20 years?

16   A    Yes, 'cause he didn't work for nothing.

17   Q    Okay.  He didn't work at all?

18   A    I did all the footwork --

19   Q    All right.  So --

20   A    -- on everything.

21   Q    But you allowed him to hold onto $600,000 for five years;

22   is that correct?

23   A    I didn't know he had that much.

24   Q    Okay.  How much did you think he had?

25   A    I -- at least 200,000.

```
 1   Q    Okay.  So in 2018 when you say you-all separated --
 2   A    I -- hey, I trusted John to the fullest.
 3   Q    Okay.  I see.
 4   A    He was my everything.
 5   Q    In 2018 --
 6   A    Whatever he say goes, that's how it was.  So don't sit up
 7   here and say that I let him.  I didn't let him do nothing.
 8                THE COURT:  Can you -- I have let this go on.
 9           It's almost like you're badgering back.  I understand
10           you're angry, but I need you to check your tone.  Do
11           you understand?
12                THE WITNESS:  Yes.  I'm just upset.  I'm sorry to
13           the Court.
14   MS. WARNER CONTINUING:
15   Q    Ms. Henson, in 2018, did you file for divorce?
16   A    No.
17   Q    In 2019, did you file for divorce?
18   A    No.
19   Q    And at that point, you thought he had about $200,000.  Is
20   that what you're saying?
21   A    Yes.
22   Q    And so --
23   A    We -- we was going to purchase a new house.
24   Q    Okay.  After you separated, you were going to buy a house
25   together?
```

```
 1    A    Yes.
 2    Q    All right.  So from '18, you didn't file.  '19, you didn't
 3    file.
 4    A    I had no money.
 5    Q    '20, you didn't file.
 6    A    I had no money.
 7    Q    '21, you didn't file.
 8    A    Didn't have not a dime.
 9    Q    '22, you didn't file; is that correct?
10    A    No money.
11    Q    So out of all of these years, you're saying you allowed him
12    to keep $200,000 in cash?
13    A    I tried to get it.
14    Q    Why didn't you try to file for a divorce?
15    A    I didn't have money.  He took every dime we had in that
16    house.
17    Q    Okay.
18    A    For years.
19    Q    Now when was the last time you worked?
20    A    Last time I worked, I worked for this -- the VA.
21    Q    When was that?
22    A    That was in 2018.  No, 2017.
23    Q    And why haven't you worked?
24    A    I have some illnesses.  I have a health ill- -- health
25    issues.
```

```
1    Q     Okay.  And what are your health issues?
2    A     Neuropathy in my feet, and I have a -- I really don't want
3    to say nothing else.
4    Q     Okay.  So right now, you're saying that you have no income,
5    but all of your bills are being paid by your daughter, correct?
6    A     My three daughters.  Yes, they are.
7    Q     Okay.  So at this point, they're paying $2,102 in expenses
8    for you?
9    A     It's less now.
10   Q     All right.  How much is it now?
11   A     It's about 1,500.
12   Q     Okay.  Ms. Henson, have you started the process to try to
13   get your part of the money?
14   A     I didn't know I had to.
15   Q     What does that mean, Ms. Henson?
16   A     I didn't know I had to ask for the money.  I thought that
17   would fall on him.
18   Q     Okay.  Now tell us, what kind of work do your daughters do?
19   A     I -- my daughters -- I have one daughter that works at the
20   Goodwill, and I have two other daughters that are in medical --
21   medical positions.
22   Q     What are their medical positions?
23   A     Pharmacy tech and a tech -- a care tech -- a care tech.
24   Q     Okay.  Now those three daughters make enough to give you
25   $2,000 a month?
```

```
 1   A    Yes, they do.  They pay every bill in that house.
 2   Q    Okay.  Now when do you plan to go back to work?
 3   A    I don't plan on going back to work.
 4   Q    And so you have been sustaining your life for four, almost
 5   five years now?
 6   A    On -- on my children -- on my children.
 7   Q    So even after this case was opened, why did you not ask for
 8   temporary support or something if you needed that?
 9             MR. OGLES:  Objection, Your Honor.  We did.  We
10        asked for it in our complaint.
11             MS. WARNER:  We've not had a hearing where she
12        asked for living expenses or money.
13             MR. OGLES:  We had a hearing last summer, and you
14        continued it.
15             MS. WARNER:  That was on a final.  Okay.
16             THE COURT:  I mean, that's just been since 2022
17        -- or actually, the amended counter -- yeah, amended
18        counterclaim was 2022.
19             MS. WARNER:  Okay.
20   MS. WARNER CONTINUING:
21   Q    At any point, did you ask for an emergency hearing or any
22   of that to get money?
23   A    No.
24   Q    And Ms. Henson, isn't that true because you've already been
25   taken care of your life?  You've already transitioned into
```

```
1    taking care of your own life; is that correct?
2    A    That's not true.
3    Q    Okay.  Now you thought he was keeping the $200,000 that
4    belonged to both of you in a box?
5    A    Yes, we did.
6    Q    So when did you plan to get your money?
7    A    We were not -- it was no planning on splitting up.  I
8    didn't need the money until we was going to buy us a new house.
9    Q    Um-hum.  Ms. Henson, it wasn't a clue to you that you were
10   splitting up that he's filed for divorce twice?
11   A    No.
12   Q    Okay.
13   A    Hum-um.  The first divorce, he came back to me.  I guess
14   now that -- now that I know this all played out, he came back
15   and we reconciled so he can get everything out of my name and
16   put it in his son's and brother's name.
17   Q    Okay.  Ms. Henson --
18   A    So that's how I -- that's how I feel now.
19   Q    Okay.  Now Ms. Henson, do you claim or do you not claim
20   he's got an interest in the house?  Does he or does he not?
21                  THE WITNESS:  He does not.
22                  MR. OGLES:  Objection, Your Honor.
23                  MS. WARNER:  Okay.
24                  MR. OGLES:  Number one, you dismissed her
25            counterclaim.  You dismissed -- I mean, their answer,
```

```
 1              their affirmative defenses.  They don't have a claim
 2              for the interest in the house because --
 3                   MS. WARNER:  Your Honor, I don't --
 4                   MR. OGLES:  -- because of sanctions.
 5                   MS. WARNER:  Your Honor, I don't believe that
 6              that's how that works.
 7                   MR. OGLES:  Well, what -- what's the purpose of
 8              sanction?  You struck his answer -- I mean, you struck
 9              his complaint and -- and answer to my counterclaim.
10                   THE COURT:  I need to look that up.
11                   MS. WARNER:  Your Honor, I don't believe that
12              even case law bears that out.  If Counsel has got a
13              case or something, of course, I'll look at that.  But
14              from what I know, if the Court is striking his
15              complaint, that does not automatically mean he doesn't
16              have a right to property he's earned.  He doesn't have
17              a right to any assets, a home.  He's entitled to half
18              of the increase in the value of that home.  Striking
19              an answer doesn't stop that specifically when she pled
20              --
21                   THE COURT:  I think Ms. Warner's right.  I think
22              Ms. --
23                   MS. WARNER:  Specifically --
24                   THE COURT:  -- Warner is correct on that.
25                   MS. WARNER:  -- when she pled for a distribution
```

```
1              of marital assets.
2                   MR. OGLES:  Well, then what's the purpose of
3              striking his answer and his complaint?
4                   THE COURT:  He's not coming in and --
5                   MS. WARNER:  For relief on that.
6                   MR. OGLES:  But on my counterclaim, specifically
7              said we want a divorce, we want the property --
8                   MS. WARNER:  No, it doesn't.
9                   MR. OGLES:  -- and the house was never mentioned.
10                   MS. WARNER:  His counterclaim, his amended
11              counterclaim says he wants a divorce but he wants the
12              Court to distribute or divide assets.
13                   THE COURT:  Yeah, I think that's correct.
14                   MR. OGLES:  It is, but then you struck his
15              answer.
16                   MS. WARNER:  But that doesn't automatically give
17              her the entire estate.
18                   THE COURT:  I -- I agree with Ms. Warner on that
19              --
20                   MR. OGLES:  Okay.
21                   THE COURT:  -- Mr. Ogles.
22    MS. WARNER CONTINUING:
23    Q    Okay.  So, Ms. Henson, you're saying that he should have no
24    interest in the house, correct?
25    A    Correct.
```

1  Q     So why do you want him to pay for the heating and air?

2  A     'Cause he destroyed my heating and air by having an

3  unlicensed person put another heating and air in the house.

4  Q     And where were you when he did this?

5  A     I was there.

6  Q     Okay.  Now as for -- you have a bank listed.  You don't

7  have a name of a bank, an account number, or an amount of money.

8  You said bank from 7/17/18 to 7/17/19.  What are you asking the

9  Court to give you from the bank?

10 A     Whatever he put in there, half of it, because I was

11 suffering -- really suffering.

12 Q     Okay.

13 A     And he had his girlfriend's name on the bank account.

14 Q     Okay.  From 7/17/18 to 7/17/19?

15 A     Yes.

16 Q     Okay.  After you separated?

17 A     Yes.

18 Q     Now Midland Mortgage, you said you quitclaimed your deed so

19 that you could get a mortgage?

20 A     Yes.

21 Q     Okay.  Why does he need to give you $4,700?

22 A     'Cause he -- he was -- John was in control of all --

23 everything.  Paying bills, doing everything.  He did not let me

24 know that he -- I did not have -- I wasn't aware that we were

25 three months behind.

```
1    Q    So this is you want him to catch up on the mortgage?
2    A    Yes.
3    Q    Okay.  Now --
4    A    'Cause I would have never went into foreclosure if it
5    wasn't for him leaving.
6    Q    So the heat and air -- Ms. Henson, why is that not just a
7    marital debt, if at all?  It's something that happened before
8    the case.  So should this Court look back into your entire
9    relationship?
10   A    It happened right before he left.  I mean, the day.
11   Q    Okay.
12   A    He went and got an air unit.
13   Q    On July 18th of '18?
14   A    I don't know.  I think it was earlier than that.
15   Q    Okay.  Ms. Henson, it's true that you don't know, do you?
16   A    I know.
17   Q    You know it happened --
18   A    It was sometime in --
19   Q    -- during the relationship?
20   A    -- it was sometime in -- in May when he got the air
21   conditioner.
22   Q    Okay.  Okay.  And when were the trucks -- the vans sold?
23   A    They were sold in -- in 2010.
24   Q    And so you brought those up today for what reason?
25   A    Showing you how much cash and assets we had.
```

1   Q    So you've seen the W -- the 1099s that he attached to his
2   tax returns, right?
3   A    Yes.
4   Q    And out of that money, is it your testimony today that you-
5   all received that money and never spent a dime of it; you just
6   kept it all?
7   A    We kept it all.
8   Q    You didn't have to pay for operating expenses, salaries --
9   A    We did --
10  Q    -- supplies?
11  A    -- we -- we did all of that.
12  Q    How'd you do that if you kept it all?
13  A    We was keeping at -- whatever we had left, we kept.
14  Q    Ms. Henson, are you just coming up with something so you
15  can --
16  A    No, I'm not.
17  Q    -- justify getting money?
18  A    We have always done this since '01.
19  Q    Okay.  But you didn't keep every dime of it like you
20  testified to, did you?
21  A    Well, we have to pay bills out of it, of course.
22  Q    Okay.
23  A    But everything else, we kept.
24  Q    Um-hum.  And did you get paid?
25  A    Yes.

```
 1   Q    Okay.  So you got paid?  Did he get paid?
 2   A    Yes.
 3   Q    All right.  You got paid.  He got paid.  You paid expenses.
 4   You bought supplies, equipment.  You had vans, trucks, trailers,
 5   cars.  So at what point do you believe you had 200,000 extra --
 6   A    I sold everything --
 7   Q    -- dollars in a box?
 8   A    -- in my daycare.  I had over -- I had six -- over 6,000
 9   square feet of daycare that I sold.  Refrigerators.  Ovens.
10   Chairs.  Tables.  Books.  Toys.  Everything.
11   Q    And you sold it?
12   A    Yes.
13   Q    Okay.  Did you give him money?
14   A    Yes.
15   Q    Okay.
16   A    It all went to him.
17   Q    All of it?
18   A    Yes.
19   Q    You didn't get anything?
20   A    (No audible response.)
21   Q    Okay.
22   A    You couldn't say I didn't get anything.  We were doing this
23   together.
24   Q    Ms. Henson, that's the point of the hearing.  You had a
25   whole marriage where there was money coming, money going.  You
```

```
1    had to pay bills, correct?
2    A    Yes.
3    Q    Okay.  At this point, what we're trying to figure out is
4    what is your claim, your valid claim, and can you prove it?
5    That's the point.  Do you understand that?
6    A    I just proved that I had the trucks, the trailers, the
7    dually, the Navigator, had a whole daycare.  We had trucking
8    company.  I still got the trucking company still --
9    Q    Ms. Henson --
10   A    -- still --
11   Q    -- do you understand -- we believe you already --
12   A    I don't understand what you're saying this --
13                THE COURT REPORTER:  One at a time, please.
14   MS. WARNER CONTINUING:
15   Q    Ms. Henson, do you -- do you understand, we believe y'all
16   had these businesses.  The point is, are you asking the Court to
17   look back through your entire relationship and find money for
18   you?  Is that what you're doing?
19   A    It's mine.
20   Q    Okay.  All right.  Now you said you have water that sits in
21   a bathtub --
22   A    Yes.
23   Q    -- 'cause there's a sewer -- sewage or plumbing problem?
24   A    Yes.
25   Q    Okay.
```

```
1    A    And he knew about it, 'cause when he was there, we was down
2    to one bathroom.  Now we're down to no -- no bathroom.
3    Q    Okay.  And that's his responsibility?
4    A    Yes.
5    Q    Okay.
6    A    It's not his responsibility, but he could have left me some
7    -- some money.
8    Q    Okay.  And so --
9    A    He left me with nothing.
10   Q    -- when you took out another mortgage on the house, how
11   much money did you get?
12   A    I didn't take out another mortgage.  They modified my -- my
13   loan.
14   Q    What is Midland Mortgage?
15   A    That's my mortgage company.
16   Q    Is that the modified loan?
17   A    Yes.
18   Q    Okay.  Now you said you had to quitclaim something.  What
19   did you quitclaim?
20   A    I had the quick deed [sic] over to my daughter.
21   Q    For what?
22   A    Because John wouldn't sign the modification -- he wouldn't
23   sign -- sign the modification letters.
24   Q    And who did you -- why did you quitclaim it to your
25   daughter?
```

1   A    That's what they told me to do, since he was being un- --

2   uncooperative.

3   Q    Okay.  And how much money did you get from quitclaiming it?

4   A    I didn't get anything.

5   Q    And so what happened when you quitclaimed it?

6   A    It -- they gave me the modified loan and they modified it

7   to, like $600 a month.

8   Q    That's what it is now?

9   A    Yes.

10  Q    Okay.  And your daughters, do they live with you?

11  A    Yes.

12  Q    And when you stopped working, were you taken off from work

13  by a doctor?

14  A    No.

15  Q    Okay.  You just stopped working?

16  A    Yeah, I had -- yes.  My client died, and I just had a

17  nervous breakdown over everything, so --

18  Q    Okay.

19  A    -- I mean, I stopped working.

20  Q    All right.  And then you expect him to pay you for a new

21  tattoo or a cover-up?

22  A    Yes.

23  Q    All right.  And he should pay a old Comcast bill?

24  A    Yes.  I want it off my credit.

25  Q    And when were the dates of that?  When did that incur?

```
 1    A     In 2018.

 2    Q     How much have you paid?

 3    A     None.

 4    Q     You have any proof of that bill with you?

 5    A     Yes.  I think my lawyer has it.

 6    Q     And the Midland Mortgage, is it now in your daughter's

 7    name?

 8    A     Yes.

 9    Q     How much you think your house is worth?

10    A     Probably 10 cent.

11    Q     Okay.  And the value you came up with for one of these

12    vehicles, where did you get the information for that?

13    A     I had -- I had a -- a letter came through the mail that had

14    valued at 9,000-something.

15    Q     Okay.  And so, Ms. Henson, is it or is it not your plan to

16    seek some of this money from the federal court?  Are you going

17    to go through that process?

18    A     I don't know.  I have to ask my lawyer about that.

19                    MR. OGLES:  Your Honor, I was doing all of that.

20                    THE COURT:  Okay.  Okay.

21                    MS. WARNER:  No further questions.

22                         REDIRECT EXAMINATION

23    BY MR. OGLES:

24    Q     Ms. Henson?

25    A     Yes.
```

```
1    Q    How much did you pay for your house; do you remember?
2    A    59,000.
3    Q    And how much do you think it's worth right now?
4    A    Ten cent.
5    Q    Pardon?
6    A    Nothing.  It's worth -- it's not worth anything.
7    Q    Well, it's not worth any more than you paid for it; is that
8    what you're telling?
9    A    Right.
10   Q    Okay.  So it's worth around 59,000?
11   A    It -- no.  Somebody offered me 30,000 for the house.
12   Q    Somebody offered you that?
13   A    Um-hum.
14   Q    Is that a yes?
15   A    Yes.
16   Q    Okay.  So you're -- you're -- what you're telling the Court
17   is it's not worth anymore than -- from the time y'all got
18   married until today, it's not worth any more than what you paid
19   for it?
20   A    No, it's not.  It's -- it's less.
21   Q    Describe the condition of the house.
22   A    My showers doesn't work.  The toilet barely flushes.  We
23   have no AC, no heat.  I need a refrigerator, a stove, all of
24   that stuff.  We was just leaving that stuff because we were
25   going to buy a new house.  So I -- that's what I thought.
```

```
 1   Q    Okay.  And you hadn't had an appraisal done on it or
 2   anything like that in the last year?
 3   A    Well, no --
 4   Q    Answer my question.
 5   A    -- I have not.
 6   Q    Have you had an appraisal done in the last year?
 7   A    No, I haven't.
 8   Q    Okay.  Or since the divorce was filed, have you had an
 9   appraisal?
10   A    No.
11   Q    Okay.  Now, I attached a exhibit to that Midland Mortgage.
12   And the mortgage is still in your name; is that correct?
13   A    Yes.
14   Q    Okay.  So make sure we're on the same page there.  And your
15   daughter --
16   A    Yes.
17   Q    -- did she co-sign the mortgage?
18   A    Yes.
19   Q    Okay.  And as we sit in here today -- and I've shown you
20   the claim Mr. Henson did -- we know there's at least 583,000 in
21   cash that he took; is that correct?
22   A    Yes.
23   Q    Okay.  And you want all of that; is that correct?
24   A    Yes.
25              MR. OGLES:  That's all I have.
```

```
 1                    MS. WARNER:  Follow-up, please?

 2                    THE COURT:  You may.

 3                    MS. WARNER:  Okay.  Okay.

 4                    RE-CROSS EXAMINATION

 5   MS. WARNER CONTINUING:

 6   Q    So, Ms. Henson --

 7   A    Yes.

 8   Q    -- when you-all separated in 2018, did he continue to pay

 9   bills?

10   A    No.

11   Q    None at all?

12   A    Not at all.  And my daughter can attest to that.

13   Q    Okay.  Did you-all separate again in 2019?

14   A    No.

15   Q    How many times did you separate?

16   A    What do you mean by separate?  We -- when he left the house

17   in 2018, we had not been together.  I have not laid eyes on him

18   to this day.

19   Q    Okay.  And so he didn't give you any money at all?

20   A    No.

21   Q    Didn't pay any bills, no nothing?

22   A    Didn't pay no bills, and my kids can tell you that.

23   Q    Okay.  So --

24   A    They were three months behind.

25   Q    -- if you claim there was an alleged $200,000 in a box, why
```

```
1    do you think you need --
2    A    I'm not just alleging that we had that kind of money.  I'm
3    talking about with assets that -- trucks and trailers that he
4    sold.  Those things are over $10,000 a piece.  So I'm not just
5    talking about money.  I'm talking about things that he has sold
6    since he left that house in 2018 --
7    Q    Ms. Henson --
8    A    -- that I should have half of that.
9    Q    -- you've provided no proof of any sales at all.
10   A    I just showed you --
11              MR. OGLES:  Okay.  I want to object 'cause I
12         asked Mr. Henson where that money came from.  He took
13         the Fifth Amendment.
14              MS. WARNER:  So she can't --
15              THE COURT:  What does that have to do with her?
16              MR. OGLES:  Well, that's -- she's saying all the
17         money was sold, and that's where the money came
18         through, and that's what we're asking for.  But she's
19         trying to trace the money through my client.  I tried
20         to trace it through his -- hers, and he wouldn't
21         answer it.
22              THE COURT:  Well, and this is a different
23         witness.
24              MR. OGLES:  I understand.
25              THE COURT:  So what are you objecting to her
```

```
1              testimony for?  What are you --
2                   MR. OGLES:  I'm not objecting to her testimony.
3              I'm objecting to the form of the question because
4              she's trying to trace the money through my client.
5                   THE COURT:  I'm going to overrule that.  I think
6              she can find out what she believed where it came from.
7              I mean, she's testified multiple times over and over
8              what she believes.
9                   MR. OGLES:  But we -- we tried to find out where
10             it came from from him.
11                  THE COURT:  I -- I understand.
12                  MR. OGLES:  Okay.
13                  THE COURT:  Her testimony is independent of his.
14                  MR. OGLES:  Okay.
15                  MS. WARNER:  Okay.
16   MS. WARNER CONTINUING:
17   Q    So, Ms. Henson, on the money, you say there was 200,000 in
18   a box but you're asking for 583; why is that?
19   A    'Cause we had assets.  We had --
20   Q    Throughout the marriage, correct?
21   A    Yes.
22   Q    Okay.  I asked you, how far back do you want the Court to
23   go and separate your marriage?  How far back?
24   A    Okay.  If you want to do it that way, at 2018.
25   Q    Okay.  All right.
```

1    A    The things that he left with and sold.

2              MS. WARNER:  No further questions.

3                   **FURTHER DIRECT EXAMINATION**

4    BY MR. OGLES:

5    Q    You know, just to make sure the Court understands, y'all

6    haven't been divorced twice, have you?

7    A    No.

8    Q    Okay.  So you --

9    A    We reconciled the first time.

10   Q    Pardon?

11   A    We reconciled the first time.

12             MR. OGLES:  That's all I have.

13             THE COURT:  I did get that because --

14             MR. OGLES:  I -- I wasn't sure.

15             THE COURT:  Yeah.  You had -- I think you had

16        asked her and then I asked about that, whether it was

17        final.  And I think that Ms. Warner brought out that

18        he dismissed that first action.

19             MR. OGLES:  I can't find it on Court Connect.

20        Did y'all file for divorce or y'all just separate?

21             THE WITNESS:  We filed for divorce.

22             MS. WARNER:  Filed for divorce.  There was a

23        order entered.

24             MR. OGLES:  It's not -- I just can't find it on

25        Court Connect.

```
 1              THE COURT:  Okay.  Thank you.  You may stand
 2         down.
 3              MR. OGLES:  Your Honor, I would recall Mr. Henson
 4         to ask him where that 583,000 came from, but he took
 5         the Fifth amendment, so.
 6              THE COURT:  He -- he's not going to answer that.
 7         He's been advised by counsel and --
 8              MR. OGLES:  But I think that's got to be
 9         construed against him.
10              THE COURT:  Well, you can argue that.
11              MR. OGLES:  Okay.
12              THE COURT:  But I don't think there's any point
13         in --
14              MR. OGLES:  I'm -- I'm not.
15              THE COURT:  -- recall.
16              MR. OGLES:  That's why I'm -- for the record, I'm
17         letting you know I would recall him because that was
18         an issue with my client how to trace it, but it's
19         unfair for her that I can't trace it through him.
20         Okay.  Making sure we're all on the same page.
21              I call my client's daughter for corroboration.
22              THE COURT:  Thank you.
23              So you have filed the paperwork to collect her
24         share of the 583,000?
25              MR. OGLES:  Yeah, I didn't file paperwork.  I
```

```
 1            have a email chain with the U.S. Attorney.
 2                 THE COURT:  So you have --
 3                 MR. OGLES:  Benecia, and she's --
 4                 THE COURT:  -- what do you have to do to collect
 5            that?
 6                 MR. OGLES:  I don't know.  There's going to be a
 7            hearing on it and they're going to let me know.  So
 8            Benecia Moore was the U.S. -- was the U.S. Attorney.
 9            Now she's a U.S. Magistrate.
10                 THE COURT:  Let me swear you in before you --
11                 [WHEREUPON, witness sworn.]
12                 THE COURT:  Thank you.
13                 MR. OGLES:  And now, Ann Gardner was the
14            attorney.  She entered an appearance on it two weeks
15            ago, is the U.S. Attorney prosecuting him.  His trial
16            is in July 2024, so it won't happen before July of
17            2024.  But yes, I have filed a claim.  I will be
18            notified.  The forfeiture action is in the indictment
19            if you look -- that's why I introduced the indictment.
20            They -- they ask for a forfeiture.
21                 So -- 'cause remember, I found out about this,
22            not through the defendant last summer, but from my
23            independent investigation.
24                 THE COURT:  Yes.  Okay.
25                 MR. OGLES:  May I proceed?
```

```
 1              THE COURT:  You may.
 2   THEREUPON,
 3                    CARRINGTON SHELTON,
 4   having been called by and on behalf of the defendant, and having
 5   first been duly sworn to tell the truth, the whole truth, and
 6   nothing but the truth, testified as follows, to-wit:
 7                        DIRECT EXAMINATION
 8   BY MR. OGLES:
 9   Q    State your name.
10   A    My name is Carrington Shelton.
11   Q    And is -- is Tippannee your mom?
12   A    Yes.
13   Q    To the best of your knowledge, has she been a resident of
14   Pulaski County the last -- at least the last year?
15   A    Yes.
16   Q    To the best of your knowledge, has she lived separate and
17   apart from Mr. Henson since 2018?
18   A    Yes.
19   Q    Okay.  Do you live with your mom?
20   A    Yes.
21   Q    Okay.  Where do y'all -- describe the condition of the
22   house.
23   A    Well, the shower is leaking so we can barely take a shower,
24   and then there's flooding throughout the house.  We don't have
25   heating or air.  Basically, the house is just, at this point,
```

1    almost nonfunctional.

2    Q    Do you have a stove?

3    A    Yes, we have a --

4    Q    Does it work?

5    A    Fifty percent, yes.

6    Q    Okay.  What about the refrigerator?  Do you have a

7    refrigerator?

8    A    Yes.

9    Q    Does it work?

10    A    Fifty percent as well.

11    Q    Okay.  Where does your mom take baths?

12    A    Currently, she's taking showers at Planet Fitness.

13    Q    And how far is that from your house?

14    A    About ten minutes.

15    Q    Does your mom have a car?

16    A    No.

17    Q    Okay.  When's the last time you've seen Mr. Henson?

18    A    Maybe two weeks ago.

19    Q    Where'd you see him?

20    A    At a baby shower --

21    Q    Okay.

22    A    -- or gender reveal.

23    Q    Pardon?

24    A    Gender reveal.

25    Q    Okay.  Who for?

| | | |
|---|---|---|
| 1 | A | His son. |
| 2 | Q | Okay.  So you -- do you stay in contact with him? |
| 3 | A | No. |
| 4 | Q | Okay.  You stay in contact with his kids? |
| 5 | A | No, not really. |
| 6 | Q | Okay.  Why were you there, then? |
| 7 | A | Well, we actually grew -- well, we grew up together, and I |
| 8 | | saw that he had a -- |
| 9 | Q | Okay. |
| 10 | A | -- gender reveal, so we just went. |
| 11 | Q | So you were there? |
| 12 | A | Um-hum, yes. |
| 13 | Q | Okay.  Do you know the last time your mom seen Mr. Henson? |
| 14 | A | No. |
| 15 | Q | Okay.  Are you aware of any personal property Mr. Henson |
| 16 | | took when he separated in 2018? |
| 17 | A | I believe cars for sure.  Anything else, I'm not sure. |
| 18 | Q | How do you know that? |
| 19 | A | 'Cause I lived there. |
| 20 | Q | You saw him? |
| 21 | A | Yes. |
| 22 | Q | You saw him take the property, the vehicles? |
| 23 | A | Yes. |
| 24 | Q | Okay.  And did you know where he took them to? |
| 25 | A | I do not. |

```
1    Q    The 2008 Ford F-350, you saw him take that?

2    A    Yes.

3    Q    The 2004 Lincoln Navigator, you saw him take that?

4    A    Yes.

5    Q    And the -- what about the '76 Monte Carlo?  Do you remember

6    him taking that?

7    A    I -- no, I do not.

8    Q    Okay.  Are you the one that's on the mortgage with your

9    mom?

10   A    Yes.

11   Q    Okay.  What -- how did you get on that?

12   A    She was actually going into foreclosure, and we went to the

13   courthouse and did a deed.

14   Q    Okay.  And so are you on the mortgage with her?

15   A    Yes.

16   Q    Okay.  And do you know how much the back payments are on

17   the mortgage?

18   A    I believe -- last time I checked, it was 4,000.

19   Q    Okay.  And the current -- are you helping make the current

20   payment?

21   A    Yes.

22   Q    How much is that?

23   A    574 --

24   Q    Okay.

25   A    -- I believe.
```

1   Q    Do you know how much the house is worth?  Do you have any
2   idea?
3   A    I do not.
4   Q    Okay.
5                   MR. OGLES:  That's all I have.
6                   THE COURT:  Thank you.  All right.  Ms. Warner.
7                   **CROSS EXAMINATION**
8   BY MS. WARNER:
9   Q    How much money do you give your money -- mother every
10  month?
11  A    I pay her mortgage and utilities, so I'm not sure.
12  Q    Okay.
13  A    But it's over a thousand.
14  Q    And who else helps to pay bills?
15  A    My sister.
16  Q    Okay.  And can you tell us why your mother doesn't work?
17  A    She actually has some health issues.
18  Q    Okay.  When was the last time she worked?
19  A    I believe in 2012 -- 2010, 2012.
20  Q    When was it?
21  A    2010, I believe.
22  Q    Okay.  That was the last time she worked?
23  A    Yes.
24  Q    Okay.  All right.  And then as for the vehicles you say
25  that were taken, what year were they taken?

```
 1   A    2018.
 2   Q    And where were you?
 3   A    I was at home.
 4   Q    The day they were taken?
 5   A    I was at home, yes.
 6   Q    Okay.  And tell us how he took both of the vehicles at the
 7   same time.
 8   A    I can't -- I can't say.
 9   Q    You don't know how he took them, he just took them?
10   A    I know he took them, yes.
11   Q    Okay.  Thank you.
12                  MS. WARNER:  No further questions.
13                  MR. OGLES:  I have nothing further.
14                  THE COURT:  Thank you.  All right.  Thank you.
15                  MR. OGLES:  Can she stay in the courtroom?
16                  THE COURT:  Sure.
17                  MS. WARNER:  I may call her back.
18                  THE COURT:  Oh, never mind.
19                  MR. OGLES:  Okay.
20                  THE COURT:  She may call her back.
21                  Okay.  You'll have to stay outside.
22                  MR. OGLES:  We rest.
23                  THE COURT:  All right.
24                  THE WITNESS:  Can I stay outside?
25                  THE COURT:  You can --
```

1    THE WITNESS:  I would like to.

2    THE COURT:  Yeah.  That's where you're --

3    MR. OGLES:  And I would object to them putting on

4    any evidence since you struck their answer and --

5    THE COURT:  I have --

6    MR. OGLES:  their complaint and their answer.

7    MS. WARNER:  That's fine.

8    THE COURT:  I don't think she was planning on

9    calling anything.

10    MS. WARNER:  No, just closing.

11    THE COURT:  Closing.

12    MS. WARNER:  I guess we can do that.

13    THE COURT:  All right.

14    MR. OGLES:  Okay.  That's all I have.

15    THE COURT:  You want to close?

16    MR. OGLES:  Oh, yes.  Absolutely.

17    Your Honor, this is a real simple case.

18    THE COURT:  It's really not.

19    (Inaudible crosstalk)

20    THE DEFENDANT:  Could we use the bathroom?

21    THE COURT:  Oh, yes.  Why don't you?  We'll take

22    about a five minute break.

23    THE DEFENDANT:  No, the puppy.

24    THE COURT:  Oh, is -- what is she doing?

25    THE DEFENDANT:  I don't know.  She was kind of

1           scooting, so I don't know if that means she needs to

2           use it or not.

3                THE COURT:  Oh.

4                MR. OGLES:  She's just itching.

5                THE COURT:  I think she's just itching.

6                THE DEFENDANT:  Okay.  Just itching.

7                THE COURT:  Yeah.  Thank you for giving the

8           warning, though.

9                MR. OGLES:  Well, it --

10                THE DEFENDANT:  She's a sweet little thing, but

11           she looks like she --

12                THE COURT:  I thought you were saying you needed

13           a --

14                THE DEFENDANT:  No, no.  Not me.

15                THE COURT:  -- break.  Okay.  All right.

16                MR. OGLES:  It's really a simple case because we

17           know the 583,000 is marital property.  He -- they're

18           still married.  So it doesn't really matter how he got

19           it.

20                I mean, we went off on a -- on a detour there,

21           and I -- I let it go.  I don't care how --

22                THE COURT:  You --

23                MR. OGLES:  -- he got it.

24                THE COURT:  -- you also helped contribute to

25           generating those questions and answers that went off

1          on that tangent, so.

2               MR. OGLES:  Well, because he took the Fifth

3          Amendment.  I had -- and because he took the Fifth

4          Amendment, he wouldn't answer the questions of where

5          the money came from.  But you have in evidence that he

6          filed a claim for 500 -- it's 549,000 and 34,000.  So

7          we know that's marital property.

8               We know that he goes and he's -- he's been

9          arrested.  He's -- he's got a federal case coming up.

10          There's also in that same indictment a forfeiture

11          case.  So we know that -- I found out about that not

12          through their discovery or affidavit of financial

13          means, as you ruled on, but I found out about it from

14          my independent investigation from talking to the U.S.

15          Attorney about this, and that is when I found out

16          about the claim that he filed.

17               So -- and then you struck his answer, and you

18          struck his counterclaim.  I mean, I keep getting that

19          backwards.  You struck his complaint.  You struck his

20          answer to my counterclaim.  So as a sanction, you

21          should give all that money to my client to punish him.

22          And as a separate sanction, he took the Fifth

23          Amendment.  If you take the Fifth Amendment, every

24          court I've been into in a civil case, they can't

25          proceed and ask for anything.  They can't even

1              testify.

2                     So I had a case several years ago in front of

3              Judge Fox, and the defendant took the -- I'm just -- I

4              know you're going to want case law or something on

5              this, I'm just trying to give you my impression of it

6              right now -- but he wouldn't let the defendant ask for

7              any relief on the civil case.

8                     So what I'm asking you to do -- number one, I

9              think the parties need to get divorced.

10                    Number two, there's been no proof, no evidence of

11             the difference in value of the house from the time my

12             client bought it until today.  And I was very specific

13             on asking my client how much it was worth unrebutted.

14             So there's no evidence that it's worth more than what

15             she paid for it.

16                    Number three is it -- it's -- it's got to have a

17             lot of repairs.

18                    And number four is simply, it was in foreclosure.

19             There was a loan modification going on.  So she -- I'm

20             asking you to give her the house.  I understand if he

21             would have brought a real estate appraiser in here and

22             said, "You know what, she bought the house in '99.

23             They got married in '01.  It's increased in value from

24             '01 until today."  There may be an argument for the

25             difference in value, but that's assuming that he put

1  on evidence of that, and he didn't.  And that's also
2  -- that's also assuming you got to reduce it by the
3  mortgage, and there's -- so there's no -- there's no
4  claim -- he doesn't get to ask for affirmative relief
5  in this case 'cause you struck his answer.  And also
6  because he took the Fifth Amendment, and I couldn't
7  trace the money, 'cause he's the only one that can
8  tell me where this money came from.
9      So we know that money's marital property.  It
10  doesn't matter -- you asked me about whether she filed
11  a claim.  She did file a claim through me, but it
12  doesn't matter.  I mean, it's still marital property.
13  All you can do is say it's -- she gets it all or she
14  gets half, then I have to go take that to the U.S.
15  Attorney and go with it as far as I can.  I'm not
16  asking you to order a federal government to do
17  something.  That's not what this is -- just like I
18  talked to you last summer about that.
19      So I would ask as a sanction against him, number
20  one, for lying, that you give us all the money that
21  the federal government is holding, then I got to
22  address my issue with them.  But number two, because
23  he took the Fifth Amendment, I couldn't trace it.
24      All this other stuff, this is really -- it's not
25  fair to my client.  You heard the testimony.  But we

1    know he took it and sold it, but I don't know how much

2    he sold it for, and he wouldn't tell me how much he

3    sold it for.  So this is basically -- that exhibit for

4    the bill of sale on the property was to kind of give

5    you a picture of what's going on here.  But if your

6    order specifically said that he failed to truthfully

7    respond to discovery, which means you can't believe

8    anything he said.

9        And his answer in counterclaim -- his complaint

10   and answer to counterclaim were stricken, and the

11   Court will reserve the issue of sanctions and division

12   of property at the final hearing.  The sanctions

13   should be give him all the money the federal

14   government has seized, if we can get it.  I don't

15   think we can.  I'm going to try.  But it was -- no

16   doubt about it, it's marital property.  And division

17   of property at the final hearing.  Well, I think you

18   should do an unequal -- a division of property on that

19   money because he lied in his discovery as a sanction.

20       So I'm asking for an unequal distribution where

21   my client gets it all.  That's pretty much it, really.

22   There's nothing else out there.  Give -- she gets the

23   house.  I'm asking you to give her the house.  The

24   only thing he's entitled to is the increase in equity,

25   the value, and he didn't put on any evidence about the

1        increase in equity.  He's not entitled to the house

2        'cause his name was never on it.

3        Thank you.

4        THE COURT:  Thank you.

5        MS. WARNER:  Sorry about that.

6        Your Honor, as for the property, on the exhibit

7        submitted, the exhibit is clearly in -- I don't know

8        if that's her writing or somebody else's handwriting,

9        but it provides no foundation or proof for any of the

10       information that is located on here.  For example,

11       she's got on here Midland Mortgage, 4,762.45.  There

12       is absolutely no corroboration as to what that number

13       means, if that number is still outstanding.

14       She then went on to testify that she quitclaimed

15       her interest over to a daughter who then got a

16       mortgage or reworked the mortgage somehow.  We have no

17       idea if that amount is still hanging out there or if

18       it will somehow included in the mortgage.

19       She then put in here 4,335 for heat and air and

20       said that that happened years ago.  I am not sure what

21       relief she is asking for.

22       Your Honor, I think the problem with this list is

23       that she's put a list of things out here but hasn't

24       told the Court when these things were purchased and

25       sold, not having proof of that.

1           She also offered testimony that was a little
2       contradictory.  She specifically stated in 2018 he
3       took all of this property.  On July 18 of 2018, he
4       took all of it, and then the two trailers were at a
5       storage place that belonged to his friend.  She then
6       said he brought it back and she had control of it.
7       After she said that, she backpedaled again and kept
8       going back and forth.
9           At this point, Your Honor, these people were
10      married for 20 years.  We have no idea where any of
11      this list of property is or went throughout the 20
12      years.  She's not provided any proof of what she's
13      asking for.  My client is saying this property was
14      gone.
15          They had a divorce that was filed and eventually
16      closed in 2014.  During that divorce, he was ordered
17      to pay her a year of living expenses and some other
18      things.  After they reconciled, she at no point came
19      to this Court or any court for relief, but is now
20      claiming she knew of him to allegedly have $200,000.
21      I don't understand her reasoning behind being
22      separated from someone -- with someone for five years
23      and claiming they're going to keep money in a shoe
24      box, a lock box, whatever.  To me, Your Honor, it just
25      doesn't make very much sense.

1    At this point --

2   THE COURT:  Well, I mean, I'm not going to lie,

3  I'm struggling with the 583,000 because I didn't get

4  to hear his testimony on that.

5   MS. WARNER:  Correct.  So what I -- my argument

6  on that, Your Honor, is I honestly feel that counsel

7  has gotten us all caught up in an issue that never had

8  a resolution in this Court from the very beginning.

9  There -- she is not foreclosed from seeking her part

10  of the money in any way.  It's just not in this forum.

11  As for the money that is taken, 583,000, she has every

12  right to assert that it is marital property or

13  whatever it is and put on her case where the money is

14  being held.  As of right now --

15   THE COURT:  You don't think they're looking for a

16  ruling from the domestic judge --

17   MS. WARNER:  No.

18   THE COURT:  -- whether that's marital property or

19  not?

20   MS. WARNER:  No.  Because their ruling --

21   THE COURT:  I don't see how.

22   MS. WARNER:  Well, this is what I know of a

23  forfeiture.  Now what I will say to the Court, I've

24  never dealt with a forfeiture of this size.  I think

25  the biggest I've dealt with was maybe 10,000.  What I

1          can say, Your Honor, is that money is now treated as a
2          party.  It is actually a party named in a case, and
3          anybody has a claim for that money.  That would be me,
4          you, anybody else who has a claim to it has to
5          participate in the case where that money is a party.
6              This Court cannot issue an order affecting that
7          because, first, it's not under this Court's
8          jurisdiction.  It's under federal jurisdiction.  He
9          cannot stop her from making whatever claim.  This is
10         literally just how it goes.
11             As for this Court making a decision, if this
12         Court makes a decision, it would then still have to be
13         litigated because the State is claiming that money
14         belongs to them because of alleged federal offenses.
15             Opposing counsel has gotten us all around the
16         mulberry bush because it is a large sum of money, and
17         I get it, but nothing stops her from putting her claim
18         in in the proper forum.  This was never it.  It's just
19         like a red herring, like Oh, my God, more than half a
20         million dollars, which is a lot of money, but nothing
21         stops her from getting her interest in it.  Spouses
22         seek relief through this all of the time in the proper
23         forum.
24             At this point, we have people who have been
25         together for 20 years.  Neither of them are working.

1          If you look at the amount of money they both had,

2          she's trying to get a $1,000 in alimony from him.

3          He's claiming he has no income.  She claims she

4          doesn't have any income.  So what I think the Court

5          could do is impute income to both of them and see what

6          it is.

7              If you look at the amount of money that he has

8          put down as his expenses, if the Court imputed that as

9          income because it's a gift from somebody else, that

10         would be $2,255 a month.  The same applies to her,

11         only it's $2,102 a month.

12             I don't know the relief that she's seeking, and I

13         also don't understand the timeliness of it.  If I felt

14         that somebody had hundreds of thousands of dollars

15         that belonged to me, I don't know that I would wait

16         for them to divorce me to put my claim in for this

17         money.  I believe Ms. Henson heard that amount of

18         money, and she just wants it.  I'd want it, but this

19         is not the forum for it and they have gotten us caught

20         all up in there.  And honestly, Your Honor, how would

21         we enforce an order from this Court through the

22         federal system?  I don't even know how that would

23         work.  And it certainly is not to be disrespectful to

24         this Court, but it's a federal issue.  They're holding

25         it; we don't have a way to just go over there and get

1          it.  And no matter what this Court does, we're still

2          stuck in their process.

3               So I'm asking the Court to grant the divorce.  I

4          think the evidence is clear that they've been

5          separated for 18 months.  She's a resident of

6          Arkansas.  But as for assets -- assets, there's a

7          whole lot of confusion on this list, and I think the

8          problem is they were married for 20 years.  Property

9          came, property went.  Money came, money was spent.

10         But at this point, she's not made a clear request for

11         what she's asking for.

12              As for the alimony, he didn't mention that in his

13         closing, so I don't know if she's abandoned that.  But

14         she's not proved that he's got the ability to pay, and

15         if she's relying on the 583,000 for him to pay, he

16         doesn't have a way to get it any faster than she would

17         have a way to get it.  So I'm asking the Court to deny

18         the alimony and order that she go through the process

19         for getting this money from the federal system.

20              THE COURT:  Thank you.

21              MR. OGLES:  Just real briefly, we are asking for

22         alimony.  We talked about it, but I think under -- you

23         can draw an adverse inference -- don't forget about

24         that -- under the jury instruction 106, and he took

25         the Fifth Amendment, and this is the same argument

1    counsel made last summer.  We're not asking you to

2    order the federal government to give us the 583,000.

3    We're asking you to award that as her marital property

4    as -- number one, as a sanction.

5        THE COURT:  You're saying that award it in the

6    event he gets it back?

7        MR. OGLES:  That's right.  Well, award it, then

8    we're going for it.  We're going to go for it.

9        THE COURT:  But she's saying that you don't have

10    to have an order from me to go for it.

11        MR. OGLES:  Well, that's -- we don't.  But I

12    mean, why would you not -- it's marital property.  And

13    I'm asking it's -- it's --

14        THE COURT:  And she's saying -- so it almost is a

15    moot issue.

16        MR. OGLES:  No, it's not a moot issue because it

17    would definitely help her if the federal government --

18    if -- if fed -- if the federal government says, "You

19    know what?  We mistakenly seized his money when we

20    arrested him with all that pot.  We're going to give

21    it back to you."  It would definitely help her.

22        And she -- number one, she can't raise moot

23    because she don't have any affirmative defenses.  So

24    no, that's -- that's not.  She's incorrect.  I mean,

25    the point is, we're specifically asking you as a

1    sanction and -- because he didn't tell the truth on

2    his affidavit of financial means.  He didn't tell the

3    truth in discovery.  He tried to hide this.  We're

4    asking you to give her that money as -- as a award of

5    the marital property.  And then that's where your job

6    stops.  We have to take it over from there.

7         I think you're okay on the house.  You understand

8    my argument there and the alimony.  Thank you.

9         THE COURT:  Thank you.

10        MR. OGLES:  But I think AMI 106 is pretty much on

11   point.  It's -- it's up to you.

12        THE COURT:  All right.  Give me just a few

13   minutes.  Do y'all want to take a break?

14        MR. OGLES:  Okay.

15        **(WHEREUPON, a break was held from 11:25 a.m. to**

16   **11:46 a.m.)**

17        THE COURT:  All right.  I'm going to grant the

18   divorce to the defendant on the counterclaim.  Parties

19   have been living separate and apart for greater than

20   18 months.

21        As to the home, the Court finds it is marital

22   property, that there's no proof he did not contribute.

23   In fact, she testified she was dependent on him to

24   help with the bills, and that when he left, it was the

25   reason it went into foreclosure.  But I am awarding

1    the defendant the house on the basis that if I'm

2    making an unequal division, it's because there's

3    uncontroverted testimony that it was acquired before

4    the marriage and that she's the one who's preserved

5    it, and after 2018, he's made no contributions.

6        As to the $583,000, the Court finds this is

7    marital property, and to the extent it's returned, the

8    parties shall each have a claim for 50-50 except that

9    off the top of that whatever is returned, $30,000 will

10   be awarded to defendant for sanctions and attorney's

11   fees for the discovery abuse that's occurred in this

12   case.

13       As to this list contained as Defendant's Exhibit

14   5, I -- there's just really no proof that these assets

15   were owned.  I mean, I really struggled with this

16   other than to say that this is possibly assets that

17   were all part of the 583,000.  So I'm -- I declined to

18   make any separate award for those items.

19       And I'm also declining to award alimony.  I mean,

20   these parties have no money.  I don't know where it

21   would come from.

22       But I am awarding the sanctions based on the

23   discovery abuses that were heard earlier this year.

24   So --

25       MS. WARNER:  Didn't hear you.  Okay.  Thirty

1         thousand how?

2                THE COURT:  That needs to come off the top, so --

3                MS. WARNER:  Of the money?

4                THE COURT:  Of the money.

5                MS. WARNER:  If it --

6                THE COURT:  So if --

7                MS. WARNER:  Okay.

8                THE COURT:  -- the federal government says,

9         There's only 30,000 out of 583,000 that's to be

10        returned, that goes to her first.

11               MS. WARNER:  Okay.

12               THE COURT:  All right.

13               MS. WARNER:  For clarity, she still has to go

14        through the process to get this, or are you saying he

15        has to do something?

16               THE COURT:  Well, I mean, I do think --

17               MR. OGLES:  I know how to do it.  I mean --

18               THE COURT:  Okay.

19               MR. OGLES:  -- I'm not asking him to --

20               THE COURT:  Right.

21               MR. OGLES:  I'm not relying on them for anything.

22               THE COURT:  I just think if there's any confusion

23        about whether there -- the federal court is looking

24        for an order from this divorce action --

25               MR. OGLES:  Right.

1        THE COURT:  -- this is going to clarify that the

2   Court finds that this would have been marital

3   property, and in that marital property, they are each

4   entitled to 50-50 of it, and -- with the exception

5   that 30,000 is going to come off for the sanctions.

6        MR. OGLES:  So the 30,000, then we divide

7   everything else 50-50?

8        THE COURT:  That's right.

9        MR. OGLES:  Yeah.  That'll work.

10       THE COURT:  All right.  Mr. Ogles, if you'll do

11   an order.

12       MR. OGLES:  Okay.  Thank you, Your Honor.  Be

13   excused?

14       THE COURT:  You may.  Thank you.

15       THE PLAINTIFF:  She's trying to taunt somebody.

16       THE DEFENDANT:  I'm not, either.  You spoke to

17   me.

18       THE PLAINTIFF:  Judge, she's -- she's trying to

19   taunt me as she's leaving out the court.

20       THE COURT:  Okay.

21       MR. OGLES:  We're -- we're leaving.

22       THE COURT:  Thank you.

23       MS. HENSON:  How -- I didn't say nothing.

24       THE COURT:  Okay.  Mr. Ronnie's going to get you

25   out the door.

1           MR. OGLES:  I can't back up quick enough.  All

2     right.  Thank you, Judge.

3           THE COURT:  Thank you.

4           MS. WARNER:  Thank you.

5           THE COURT:  Thank you.

6           **[PROCEEDINGS CONCLUDED AT 11:50 A.M.]**

7                           *  *  *